[Civ. No. 15902. Third Dist. Apr. 7, 1977.]

THOMAS P. RALEY, Plaintiff and Respondent, v.
CALIFORNIA TAHOE REGIONAL PLANNING AGENCY et al.,
Defendants and Appellants;
BUSINESS AND TRANSPORTATION AGENCY et al.,
Defendants and Respondents.

## COUNSEL

Downey, Brand, Seymour & Rohwer, Robert R. Harlan and James M. Day, Jr., for Plaintiff and Respondent.

Evelle J. Younger, Attorney General, Carl Boronkay and R. H. Connett, Assistant Attorneys General, and E. Robert Wright, Deputy Attorney General, for Defendants and Appellants.

Harry S. Fenton, John B. Matheny, Robert A. Munroe, Stephanie G. Sakai, Larry Thelen and Rosemary Dealey Woodlock for Defendants and Respondents.

## OPINION

**FRIEDMAN, J.**—Plaintiff Raley proposes to build a 26-acre regional shopping center called "Northshore Mall" adjacent to State Highway 28 near the northwest shore of Lake Tahoe. At Raley's behest the trial court issued (1) a peremptory writ of prohibition[1] permanently restraining the California Tahoe Regional Planning Agency (CTRPA) from interfering with his development, as well as a writ of mandate (2) directing the State Business and Transportation Agency and the State Department of Transportation to issue a highway encroachment permit and (3) ordering the County of Placer to issue grading and building permits. CTRPA appeals.

CTRPA is one of two regional, statutory agencies exercising authority in the fields of resource conservation and land-use planning and control in the Lake Tahoe basin. In 1967 and 1968 the California and Nevada Legislatures passed statutes forming the components of an interstate compact, to be effective when approved by the federal Congress. Congressional approval occurred in December 1969. The compact (Gov. Code, § 66801) establishes a bistate commission under the name Tahoe Regional Planning Agency (TRPA), charging it with establishment of interim and definitive regional plans as well as the adoption of region-wide ordinances designed to effectuate those plans. (See general-

[1]The writ of prohibition is misnamed. That sort of writ lies only to restrain actions of agencies exercising judicial power. (*Whitten* v. *California State Bd. of Optometry*, 8 Cal.2d 444 [65 P.2d 1296, 115 A.L.R. 1].) We view the so-called writ of prohibition as one of "prohibitory" mandate. (See 5 Witkin, Cal. Procedure, Extraordinary Writs, § 202.)

ly, *People* ex rel. *Younger* v. *County of El Dorado,* 5 Cal.3d 480 [96 Cal.Rptr. 553, 487 P.2d 1193].) The bistate agency consists of ten members, five of them Californians, five Nevadans. A majority vote of the five members representing each state is required for agency action.

Concurrently with the interstate compact, the 1967 California Legislature created CTRPA as a separate California counterpart of the bistate agency. (Stats. 1967, ch. 1589, § 3; Gov. Code, § 67000 et seq.) In effect, although not in express terms, the five California members of the bistate agency were to constitute the governing body of the California agency (former Gov. Code, § 67041, as adopted in 1967). Like its bistate counterpart, CTRPA was directed to promulgate interim and definitive plans for regional development and to promulgate ordinances to effectuate these plans. It received authority to review public works projects within the region.[2] The 1967 legislation directed CTRPA to adopt a regional interim plan within 90 days after its formation and a regional general plan (including a land-use plan) within 18 months after its formation. (Gov. Code, §§ 67070, 67073.) It was directed to adopt ordinances to effectuate these plans. (Gov. Code, § 67100.) Although the governing statutes did not directly authorize CTRPA to review private developments, it is undisputed that CTRPA's regional plans and land-use ordinances could invest it with varying kinds and degrees of control over private developments and projects.

Preceding a time in 1974, the five CTRPA members formed the five-member California delegation on the bistate agency. Prior to 1974 CTRPA had no staff of its own, made informal use of the TRPA staff after the latter commenced operations and held joint meetings with the bistate agency. At the joint meetings of the two boards the five CTRPA members would separately review proposed California public works projects before their presentation to the bistate agency. According to minutes maintained by TRPA, a motion to approve or reject a California public works project would first be made by a CTRPA member and put

---

[2]Government Code, section 67103: "All public works projects shall be reviewed prior to construction and approved by the agency as to the project's compliance with the adopted regional general plan."

Government Code, section 67103.1: "All public works projects submitted to the agency for review and approval must receive the agency's approval before they can be submitted to the Tahoe Regional Planning Agency."

Government Code, section 67104: "All public works projects for which state or federal funds are requested shall be approved by the agency as to the project's compliance with the adopted regional plan prior to submission of application to the state or federal agency."

to the vote of the members of that agency; a second motion would then be made by a TRPA member, and the TRPA members, including the five· Californians who had just voted on the CTRPA proposal, would then vote as TRPA members. Private or commercial projects (as contrasted with public works) would be reviewed by TRPA alone, for at that time CTRPA had not adopted regulations requiring separate review of private developments on the California side of the lake.

Plaintiff Raley controls the Northshore Mall development site by means of leases with options to purchase. In January 1973 he received a preliminary approval from Placer County, which imposed a number of conditions as prerequisites for the ultimate issue of building permits. The permit called for the approval of TRPA plus approvals of phases of the project by the county planning department, a local fire district, a local air pollution control district and a state regional water pollution control board. One of the conditions called upon Raley to form a storm drainage maintenance district; another called for an encroachment permit from the state highway agency for entrances onto State Highway 28.

Raley then submitted his proposed project to TRPA, the bistate agency, for review and action. TRPA reviewed the Northshore Mall proposal pursuant to a land use ordinance it had adopted earlier. At a joint meeting of the TRPA and CTRPA boards on June 27, 1973, TRPA approved the Northshore Mall project by a six-to-four vote, the affirmative votes including three from each state. It attached a number of conditions to its approval, including arrangements for storm runoff and approval by the California Department of Transportation of access to and from Highway 28. There was at that time no claim by CTRPA that any of the subsidiary features of the Northshore Mall, such as the Highway 28 alteration, constituted a public works project subject to CTRPA's approval authority under Government Code sections 67103 and 67104 (fn. 2, *ante*).

Meanwhile the 1973 California Legislature was in the process of considering changes in the composition of CTRPA. As a result of 1973 legislation becoming effective January 1, 1974, the governing board was enlarged from five to seven members. (Gov. Code, § 67041, as amended by Stats. 1973, ch. 1064.) On April 24, 1974, the first meeting of the enlarged seven-member CTRPA board took place. At that meeting the board took action affecting the Northshore Mall. It decided for the first time to review, as a public works project, the Highway 28 improvement plan providing access to the Northshore Mall; to require preparation of

environmental impact reports for the Highway 28 alteration as well as for the storm drainage district required by the Placer County permit.

On April 30, 1974, following its April 24 decision, CTRPA sent letters to the Placer County building department and to the district director of the State Department of Transportation, notifying them that environmental impact reports would be required relative to the formation of the storm drainage district as well as the improvements to Highway 28. These letters requested that no permits be issued for work on the Northshore Mall site or on Highway 28 pending receipt and review of environmental impact reports and approval of the Highway 28 alteration by CTRPA as a public works project. Upon being made aware of CTRPA's action, Raley unsuccessfully sought to persuade the agency to withdraw its assertion of jurisdiction.

At a meeting on May 10, 1974, the CTRPA board, over the protests of Raley's representatives, adopted a resolution expressing its intention to reexamine private projects not under construction on January 1, 1974, even though these projects had already been approved by TRPA. On July 2, 1974, Raley instituted the present lawsuit. His petition charged that CTRPA's assertion of jurisdiction over phases of the Northshore Mall project was void for several reasons, including: (1) CTRPA had approved plaintiff's project in a joint session with TRPA on June 27, 1973, and was thus barred from further review; (2) CTRPA had jurisdiction only over public works projects and no phase of the Northshore Mall fell into the category, (3) that CTRPA should be estopped from asserting jurisdiction because of its joint action with TRPA on June 27, 1973, and by leading plaintiff to rely upon the belief that no further review of the project would be required.

On July 21, 1974, 10 days after the institution of the present lawsuit, CTRPA adopted an interim plan, subjecting private commercial projects to review for "adverse environmental impact" and requiring review of those California projects which had previously been approved by TRPA but "for which actual construction [had] not commenced." (Ultimately, in August 1975, CTRPA adopted a regional plan and in September 1975 a land use ordinance affirming its approval power over private, commercial projects.) The parties have agreed that the interim plan, if

applicable, would subject the Northshore Mall project to approval or rejection by CTRPA.[3]

After receiving evidence and stipulations, the trial court made findings, declaring that CTRPA's actions of April 1974 had prevented Raley's performance of conditions imposed by the other public agencies; that CTRPA had no power to review private developments until it adopted its interim plan on July 12, 1974; that CTRPA's actions of April 1974 delayed and prevented Raley from obtaining all approvals and permits necessary to commence on-site construction and to acquire a "vested right" prior to July 12, 1974. The court found that Raley had expended $150,000 in justifiable reliance on the final approval action of TRPA and CTRPA at the agencies' joint meeting of June 1973; that in 1974 Raley had applied to Placer County for grading and foundation permits and had applied to the State Department of Transportation for a highway encroachment permit. The court concluded, as a matter of law, that the combined approvals of Placer County and TRPA in 1973 constituted an effective administrative permit for the development of Northshore Mall, which permit had no expiration date; that the proposed improvements to Highway 28 did not constitute a public works project; that application of the California Environmental Quality Act was not an issue in the case;[4] that principles of estoppel, substantive due process of law and res judicata prevented CTRPA from claiming that Raley had not acquired a vested right prior to CTRPA's adoption of its interim plan on July 12, 1974.

I

The trial court's decision and the parties' debate revolve around two articulations of legal doctrine. ■ One is the conventional principle

[3]Included in the record is the following stipulation: "CTRPA adopted an Interim Plan on July 12, 1974 which applies to the Northshore Mall project and requires CTRPA review and approval thereof prior to the issuance of grading, building foundation or building permits by the County of Placer and prior to the commencement of construction unless Petitioner acquired a vested right prior to July 12, 1974 or unless CTRPA is estopped from applying the Interim Plan to Petitioner or unless principals [sic] of substantive due process prevent the application of the Plan to Petitioner. Under the Interim Plan CTRPA has had authority since a date not earlier than July 12, 1974, to review private projects for environmental effect."

[4]Placer County's grant of preliminary approval occurred in January 1973. At that time operation of the California Environmental Quality Act (CEQA) had been suspended by "moratorium" legislation. (Pub. Resources Code, § 21171.) Raley's application to TRPA, the bistate agency, had been accompanied by a document entitled Environmental Information Report, which apparently satisfied that agency's need for compliance with the National Environmental Policy Act. (42 U.S.C. § 4321 et seq.)

of equitable estoppel: "The doctrine of equitable estoppel is founded on concepts of equity and fair dealing. It provides that a person may not deny the existence of a state of facts if he intentionally led another to believe a particular circumstance to be true and to rely upon such belief to his detriment. The elements of the doctrine are that (1) the party to be estopped must be apprised of the facts; (2) he must intend that his conduct shall be acted upon, or must so act that the party asserting the estoppel has a right to believe it was so intended; (3) the other party must be ignorant of the true state of facts; and (4) he must rely upon the conduct to his injury." (*Strong* v. *County of Santa Cruz,* 15 Cal.3d 720, 725 [125 Cal.Rptr. 896, 543 P.2d 264].) ■ Equitable estoppel may be applied against the government where justice and right require it and "in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." (*City of Long Beach* v. *Mansell,* 3 Cal.3d 462, 496-497 [91 Cal.Rptr. 23, 476 P.2d 423].)

■ The second expression is the *vested rights* rule. Generally, a property developer is vulnerable to shifts in zoning or other land use regulations occurring during the preparatory stages of his project. (*Selby Realty Co.* v. *City of San Buenaventura,* 10 Cal.3d 110, 125 [109 Cal.Rptr. 799, 514 P.2d 111]; *Russian Hill Improvement Assn.* v. *Board of Permit Appeals,* 66 Cal.2d 34, 39 [56 Cal.Rptr. 672, 423 P.2d 824].) By issuing approvals preparatory to a building permit, the government makes no representation that the developer will be exempt from changing land-use regulations; he must comply with the ordinances in effect at the time he secures a building permit. (*Avco Community Developers, Inc.* v. *South Coast Regional Com.,* 17 Cal.3d 785, 793, 795 [132 Cal.Rptr. 386, 553 P.2d 546].) Once the developer secures a building permit and expends a considerable sum of money in reliance on it, he may acquire a vested right which protects him against shifting governmental regulation. (*Id.,* at pp. 791-793.)[5]

■ The present judgment cannot stand because the trial court did not conduct the balancing process requisite to estoppel in land-use cases.

[5]Several decisions intimate that a building permit may no longer be the *sine qua non* of a vested right if preliminary public permits are sufficiently definitive and manifest all final discretionary approvals required for completion of specific buildings. (*Aries Dev. Co.* v. *California Coastal Zone Conservation Com.,* 48 Cal.App.3d 534, 544 [122 Cal.Rptr. 315]; *Environmental Coalition of Orange County, Inc.* v. *Avco Community Developers, Inc.,* 40 Cal.App.3d·513, 523 [115 Cal.Rptr. 59]; cf. *Avco Community Developers, Inc.* v. *South Coast Regional Com., supra,* 17 Cal.3d at p. 795; *Oceanic California Inc.* v. *North Central Coast Regional Com.,* 63 Cal.App.3d 57, 71 [133 Cal.Rptr. 664].)

Before estopping an environmental control agency, a court must decide whether the injustice to the developer has "sufficient dimension" to justify his insulation from the public interest in environmental regulation. (*City of Long Beach* v. *Mansell, supra,* 3 Cal.3d at pp. 496-497; *People* v. *Department of Housing & Community Dev.,* 45 Cal.App.3d 185, 195-197 [119 Cal.Rptr. 266].) The trial court summarized this phase of its inquiry by a finding that there was "little or no possibility of a recurrence of the governmental action involved." The finding expresses nothing more than a belief that the Northshore Mall would be an isolated case, hence the environmental consequences would be negligible. The finding represents an inadequate inquiry. The weighing process enjoined in *Mansell, supra,* can be fulfilled only by matching the land developer's injury against the environmental consequences of his project.[6] As we understand the matter, the Northshore Mall regional shopping center would occupy approximately 26 acres in a sparsely developed, partially wooded area near the Lake Tahoe shoreline, quite removed from existing urban centers. According to traffic estimates, the fully developed shopping center would generate about 11,500 automobile trips per day. For good or for ill, its presence would be a significant factor in the shifting balance between the region's natural attractions and its economic development. The public interest in regional environmental control on the California side of the lake had been emphatically described by statute. (Gov. Code, §§ 67000-67002.) The trial court erred by failing to conduct an inquiry and to make findings concerning the relative harm suffered by the developer, on the one hand, and by the policy of environmental equilibrium on the other.

Were this failure the only error, it would be necessary to remand the case for a limited new trial. Additional concerns impel us to conclude that Raley is not entitled—and CTRPA is not vulnerable—to an estoppel, thus that the appellants should have judgment.

## II

■ Raley does not contend that he acquired a vested right before July 12, 1974, when CTRPA adopted its interim plan, subjecting his

---

[6]This court conducted such an inquiry in *People* v. *Department of Housing & Community Dev., supra,* 45 Cal.App.3d at pages 197-198, and imposed the bar of laches (i.e., a form of estoppel) against the government only after finding a minimal invasion of environmental interests. That case lent itself to a counterbalancing process on appeal without taking new evidence.

commercial building projects to its review and veto power. He had no building permit and had poured no concrete. He contends (and the trial court held) that his project's 1973 approval by the bistate agency, including the California membership, was res judicata.[7] To the contrary, by issuing approvals leading to work preliminary to construction, TRPA and CTRPA made no representation that the landowner would be exempt from land-use regulations prevailing when, at a later time, he would apply for a building permit. (*Avco Community Developers, Inc.* v. *South Coast Regional Com., supra,* 17 Cal.3d at p. 793.) ■ The Legislature delegated to CTRPA authority to enact interim and regional plans and to adopt ordinances and regulations effectuating these plans. (Gov. Code, §§ 67070, 67073, 67100.) The delegation is valid. (See *People* ex rel. *Younger* v. *County of El Dorado, supra,* 5 Cal.3d at pp. 494-498; *CEEED* v. *California Coastal Zone Conservation Com.,* 43 Cal.App.3d 306, 323-324 [118 Cal.Rptr. 315].) The parties do not question the general validity of the interim plan adopted by CTRPA on July 12, 1974, and its successors, the regional plan adopted in August 1975 and the land use ordinance adopted in September 1975. These enactments currently require agency review of commercial projects such as Raley's. ■ A court will not issue orders for the construction of improvements contrary to existing land-use regulations; absent the emergency of a vested right, an agency may revoke a permit on the basis of later changes in the land-use regulations. (*Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d at pp. 125-126 [109 Cal.Rptr. 799, 514 P.2d 111].) The trial court erred by conferring finality on the 1973 permit issued by TRPA.

Raley's res judicata argument rests upon the theory that a project may receive the protection of an estoppel without fulfilling the demands of the vested rights rule. The latter is·a special expression of the general estoppel doctrine, not a separate rule of law. " '[T]he vested rights theory is predicated upon estoppel of the governing body.' " (*Spindler Realty Corp.* v. *Monning,* 243 Cal.App.2d 255, 269 [53 Cal.Rptr. 7], quoting from *Anderson* v. *City Council,* 229 Cal.App.2d 79, 89 [40 Cal.Rptr. 41]; see also, *Avco Community Developers, Inc.* v. *South Coast Regional Com., supra,* 17 Cal.3d at p. 793.) As a building development evolves from

---

[7]The term res judicata· is a misnomer. That phrase fixes a point of finality in the decision-making processes of the judicial branch. (See 4 Witkin, Cal. Procedure, Judgment, § 147, p. 3292.) If a descriptive phrase is needed to describe finality of an administrative decision, *functus officio* would be more accurate. A number of authorities have refused to apply res judicata to the administrative process. (See 2 Am.Jur.2d, Administrative Law, § 531, p. 343.)

drawing board into reality, the vested rights rule establishes a stage of progress when reliance upon governmental assurances estops the government from asserting new or different regulations. Because TRPA's 1973 approval invested Northshore Mall with no immunity from future land-use regulations, it was not an assurance upon which Raley could justifiably rely. (*Avco Community Developers, Inc.* v. *South Coast Regional Com., supra,* 17 Cal.3d at p. 793.) When on July 12, 1974, CTRPA adopted its interim plan, Raley had not fulfilled the requisites of the vested rights rule, had no building permit and had spent no money for actual construction. No estoppel could be predicated upon this array of elements.

## III

An alternative source of Raley's estoppel claim is an equitable-moral condemnation of CTRPA's activities of April 1974. The claim requires the assumption that arbitrary, discriminatory conduct of the land-use agency may engender an estoppel independently of the builder's acquisition of a vested right. We analyze the conduct without investigating the assumption. (See, however, *Selby Realty Co.* v. *City of San Buenaventura, supra,* 10 Cal.3d at p. 126, fn. 11; *Russian Hill Improvement Assn.* v. *Board of Permit Appeals,* 66 Cal.2d 34, 37, fn. 5 [56 Cal.Rptr. 672, 423 P.2d 824]; *G & D Holland Construction Co.* v. *City of Marysville,* 12 Cal.App.3d 989, 994-995 [91 Cal.Rptr. 227].)

When the Northshore Mall was approved at a meeting of the bistate agency in June 1973, the California members made no claim that the privately financed Highway 28 alteration would constitute a public works project, requiring its separate approval. (See Gov. Code, §§ 67103-67104, fn. 2, *ante.*) The following year, on April 24, 1974, the expanded CTRPA board held its first meeting. For the first time it chose to view the Highway 28 alteration as a public works project, to be separately reviewed by it and to be supported by an environmental impact report under the California Environmental Quality Act.[8] Having effectively barred Raley from further progress, CTRPA on July 12, 1974, adopted its interim plan, subjecting commercial projects such as Raley's to review and possible veto without regard to the bistate agency's prior approval.

---

[8]CTRPA's April 1974 action also called for an environmental impact report on formation of a storm drainage district which Placer County had originally required as a prerequisite for a building permit. Placer County, however, had dropped the storm drainage district demand. The parties have stipulated that formation of a storm drainage district is no longer a required condition.

The trial court found that both CTRPA and TRPA had led Raley to believe that further or separate reviews by CTRPA would be unnecessary; that CTRPA's actions of April 1974 were arbitrary and capricious, designed to delay Raley from gaining a state highway encroachment permit; that had it not been for the delaying action by CTRPA, Raley would have had all necessary permits and the Northshore Mall would have been under construction by July 12, 1974. The trial court held, as a matter of law, that the privately financed Highway 28 alteration was not a public works project.

CTRPA disputes the trial court's finding that Raley would have had the ability to get under construction (that is, to acquire a vested right) by July 12, 1974. The finding is supported by substantial evidence, hence is binding on appeal.[9] The trial court's imputation of arbitrary and capricious administrative action is a different matter. The facts before the administrative agency were uncontradicted; their effect is a question of law; the characterization assigned to those facts by the reviewing trial court does not control the appellate court. (*Aries Dev. Co.* v. *California Coastal Zone Conservation Com., supra,* 48 Cal.App.3d at p. 545.) ■ We disagree with the trial court's finding of arbitrariness and capriciousness, also with its conclusion that the Highway 28 alteration was not a public works project.

The April 1974 actions of CTRPA must be viewed against a background of history. (See generally, Spradling, *Regional Government for Lake Tahoe,* 22 Hastings L.J. 705.) The unique and unsurpassed beauty of the bistate Tahoe Basin and the acute ecological threats posed by the pressures of urbanization have been graphically described by the state Supreme Court. (*People* ex rel. *Younger* v. *County of El Dorado, supra,* 5 Cal.3d at pp. 485-486.) A bistate study published in 1967 recommended concurrent California and Nevada legislation to establish a Tahoe regional agency, armed with power to develop and enforce a land-use plan for the entire basin, to override local plans and local approvals and to enjoin threatened violations. Bills implementing these recommendations were introduced in both Legislatures but were soon tempered by enfeebling amendments. Under the amendments, the governing body of the regional agency would consist of ten members; three of the five members from each state would be members of county or city governing

---

[9]Although an injunction suit aimed at the Raley project was pending in the federal courts (see *League to Save Lake Tahoe* v. *Tahoe Reg. Plan. Agcy.,* 507 F.2d 517), the record contains no evidence that the lawsuit prevented Raley from commencing construction during the period April to July 1974.

bodies within the region; the votes of three of the five members from each state would be needed to authorize any action; assessments against the counties in the region would provide the bistate agency's financial support.

A companion California bill proposed a California regional agency (CTRPA) whose five members would constitute the California delegates on the bistate agency. CTRPA would receive its financial support from assessments imposed against the three local governments from whence three of its members sprang. (See *People* ex rel. *Younger* v. *County of El Dorado, supra,* 5 Cal.3d 480.)

Pressured into identical shape, the amended California and Nevada bills passed both Legislatures and received congressional approval in 1969 as an interstate compact. (Pub.L. No. 91-148, 83 Stat. 360 (1969); Gov. Code, § 66801, as amended by Stats. 1968, ch. 988; Nev. Rev. Stats. §§ 277.190-200 (1968).) Lofty and eloquent policy declarations of both Legislatures formed a prelude to the compact. These declarations described the threatened deterioration of the Lake Tahoe region and expressed an imperative need for a planning agency with power to exercise effective governmental controls. (Gov. Code, § 66801, art. I.)

The powers actually delegated to the bistate agency fell far short of the lofty legislative proclamations. The agency's domination by local government, its financial dependence on local government, the peculiar double-majority voting provision and its lack of power over local planning measures saddled the scheme with congenital infirmities.[10]

Like its bistate counterpart, the five-member CTRPA board was dependent for financial support on the local governments represented by three of its members. Whether for this or for other reasons, CTRPA

---

[10]See generally, Spradling, *op. cit.,* 22 Hastings L.J. at pages 726-738.

In *People of St. of Cal.* ex rel. *Younger* v. *Tahoe Reg. P. Ag.,* 516 F.2d 215 (cert. den., 423 U.S. 868 [46 L.Ed.2d 97, 96 S.Ct. 131]), a proposed hotel-casino at Lake Tahoe received a land-use permit from a Nevada county, then applied to TRPA for review of the county action. At a TRPA meeting the five California delegates voted to reject the proposal, as did two Nevada delegates; three Nevada delegates voted approval. Applying the double-majority requirement of the interstate compact, the federal court held that TRPA had taken no effective action, thus that the county approval of the casino could not be disturbed. In effect, the double-majority clause subordinated the composite decision of the seven-member majority of TRPA to the decision of the Nevada minority. With some restraint, the court observed that as a result of deliberate choices of the federal Congress and of the Nevada and California Legislatures, the interstate compact "may not be a powerful anti-growth measure." (516 F.2d at p. 220.)

utilized the services of the TRPA staff and had no staff of its own. Although it had authority to adopt higher standards affecting the California side of the lake (Gov. Code, § 66801, art. VI, subd. (a)), it fulfilled its statutory planning mandates by adopting the California portions of plans evolved and approved by the bistate agency. At that, CTRPA's pre-1974 planning activities are beclouded by inadequate records of its official actions. Aside from its review of California public works projects, CTRPA spent its early years as little more than an appendage of TRPA.[11]

Some such conditions apparently led to the 1973 California legislation, amending the CTRPA governing statutes. Two members were added to the California board, the representatives of local governments now being outnumbered four to three. (Gov. Code, § 67041.) The board was directed to take final action on individual projects, public or private, within 60 days from receipt of the proposal. (Gov. Code, § 67100.1.) It was freed from financial dependence on local government and directed to submit its proposed support budget to the Legislature. (Gov. Code, § 67120.) In practical terms, the 1973 amendments transformed CTRPA from an auxiliary of the bistate agency into an independent, functioning organization.

At the opening meetings of the reconstituted CTRPA, the board members faced up to the necessity of meeting their responsibilities with enough dispatch and certainty to control a number of ongoing building developments, among them the Raley project.[12] Three central problems emerged: first, the necessity for an early, updated interim plan to provide guidance for the board, for local planners and for land developers; second, unwillingness (particularly on the part of the new members) to rubber-stamp the bistate agency's past permits for private development projects; third, attainment of independent review without undue damage to developers who had spent money on planning or on actual construction in reliance on TRPA approvals. Ultimately, the CTRPA interim plan adopted on July 12, 1974, decreed that TRPA's prior approvals would not exempt projects from independent review unless construction had been started.

[11]In its regional plan, adopted in August 1975, CTRPA declared that, except as to voting on public works projects, it had been "comparatively dormant" until April 1974. (regional plan, p. 6.)

[12]The appeal record is sparse at this point. It includes no recorded minutes of the crucial April 24, 1974, meeting of CTRPA. The prime source of information is a transcript of discussions at a CTRPA meeting on May 10, 1974.

The trial court inferred that CTRPA's newly voiced authority to review the Highway 28 project was designed to halt the Northshore Mall's progress until CTRPA could establish firm administrative control through its forthcoming interim plan. The inference does not stamp the action with arbitrariness or illegality. The very reason for the CTRPA overhaul was the California Legislature's dissatisfaction with the bistate agency. Although Northshore Mall had received the latter's approval, it was apparently one of a series of environmentally significant developments which aroused a keen sense of responsibility on the part of the newly revamped CTRPA board. Genuine official worry over genuine environmental problems belies the trial court's imputation of arbitrariness and capriciousness. Anxiety and not tyranny underlay the board's actions.

■ Contrary to Raley's contention, CTRPA's assertion of authority to review the Highway 28 alteration as a public works project was not at all unlawful. Basis of the claimed authority was Government Code section 67103. (Fn. 2, *ante.*) The work was to consist of the installation of a left-turn lane with an accompanying widening of the paved highway for a distance before and beyond the turn lane. The State Department of Transportation was to issue an "encroachment permit" authorizing Raley to perform the work at his own expense.[13] The highway, of course, was publicly owned and publicly used. The project thus bore a hybrid public-private character.

For general purposes public works are defined as "fixed works (as schools, highways, docks) constructed for public use or enjoyment [especially] when financed and owned by government." (Webster's Third Internat. Dict.) Raley emphasizes that the Highway 28 work was to be done at private and not public expense. He points out that during CTRPA's existence the State Department of Transportation had issued a great number of encroachment permits in the region without any assertion of jurisdiction by CTRPA.

■ The kind of facility or activity classed as a public work or public works project is a matter of statutory interpretation, which varies with statutory objective and verbal context. (*Priest* v. *Housing Authority,* 275 Cal.App.2d 751, 754 [80 Cal.Rptr. 145]; *Swanton* v. *Corby,* 38 Cal.App.2d

---

[13]In May, 1974, the Department of Transportation notified Raley that it would issue the encroachment permit whenever it could do so without prejudice to CTRPA's assertion of authority over the Highway 28 alteration project.

227, 230 [100 P.2d 1077]; a case cited in the briefs, *Plan for Arcadia, Inc.* v. *City Council of Arcadia,* 42 Cal.App.3d 712 [117 Cal.Rptr. 96], is not in point.) Some statutes specially define these terms for their own purposes. (See, e.g., Gov. Code, § 15501; Lab. Code, § 1720.) Although the CTRPA legislation directs the agency to review public works projects, it does not define the phrase. The legislation calls for an area-wide planning agency to exercise effective environmental controls (Gov. Code, § 67002); directs the formulation of a regional plan which shall include a transportation plan "for the integrated development of a regional system of transportation . . . for the movement of people and goods within the region" *(id.,* § 67070, subd. (b)(2)); authorizes review of public works projects for compliance with the regional plan. (See fn. 2, *ante.*)

 In view of these major objectives, the source of construction funds for a particular facility is far less important than its availability for public use, the extent of public use and the projected impact on the network of related public facilities. In evidence is a traffic study showing that the stores and other commercial facilities in the fully developed Northshore Mall would contain 229,000 square feet as compared with an aggregate of 134,000 square feet in two Lake Tahoe communities within 20 minutes' driving time; that the Northshore Mall would generate approximately 11,500 daily automobile trips, causing substantial increases in the traffic flow on Highway 28. Public use of the Highway 28 left-turn facility, which provided principal ingress and egress between the Mall and the public transportation network, would be relatively heavy. The alteration project's impact on the quantum and directions of regional traffic flow would be incomparably greater than a highway entrance to a private dwelling or single store and comparably greater than many a publicly financed street improvement. In this particular statutory context, the phrase *public works project* should be construed to include construction or alterations in publicly owned and publicly used facilities, including privately financed alterations which, in the discretionary judgment of the CTRPA board, have a substantial impact on its regional plan. The board acted within its authority in categorizing Raley's Highway 28 alteration as a public works project.

The trial court erred in characterizing CTRPA's activities in April 1974 as arbitrary, capricious and (with reference to the Highway 28 alteration) illegal.

## IV

On the assumption that estoppel may not be available to prevent CTRPA's repudiation of the permit once granted by TRPA, Raley charges the state with depriving him of his investment without due process of law. He does not specify how this deprivation may be redressed short of a construction permit issued in violation of existing environmental controls. The due process theory simply injects a constitutional coloration into the estoppel argument.

Nevertheless, the denouement of this lawsuit leaves the members of this court, as appellate chancellors in equity, with a dissatisfied sense of justice. In hard fact, Raley spent $150,000 in reliance upon a land-use permit lawfully granted by a state instrumentality which was then repudiated by a related state instrumentality. The two agencies had overlapping membership and occupied a relationship of mutual awareness and privity. (See *Lerner* v. *Los Angeles City Board of Education,* 59 Cal.2d 382, 398-399 [29 Cal.Rptr. 657, 380 P.2d 97].)

Several factors combined to cause the developer's loss and prevent its redress. Raley is the victim of maladroitly engineered environmental controls. California's current need for 200,000 new jobs each year can be met only by a flow of venture capital. The protection of the state's remaining environmental amenities unavoidably constricts this flow. The competing needs of economic development and environmental protection can be brought into balance only through competent, speedy and authoritative decision-making. "California is faced with a bewildering number of conflicting planning jurisdictions, none of which have the responsibility or the capability to adequately carry out comprehensive regional planning. . . . Most state-mandated planning is done by numerous overlapping single-purpose agencies (there are over 100 in the state), each with a varying degree of authority to enforce its plan." (Marks & Taber, *Prospects for Regional Planning in California,* 4 Pacific L.J. 117, 118, 124; see also, Comment, 25 Hastings L.J. 1165.)

The mechanisms at work here combined to "protect" the environment by protracted and undependable administrative procedures followed by years of litigation. Only the most hardy and well-heeled can run so harsh

a gauntlet.[14] Burdened by land costs, loan interest, architectural, engineering and attorney fees, many entrepreneurs run out of money or heart or both long before the finish line.

Handmaiden of prevailing administrative anarchy is the vested rights rule, as voiced by the authoritative decisions cited earlier. The vested rights rule gives a green light to administrative vacillation virtually up to the moment the builder starts pouring concrete. The rule has been described as a "common law" rule and as a "constitutional common law principle."[15] It is neither. The rule, as we have observed, is a manifestation of equitable estoppel.

Historically, estoppel was administered by the equity chancellor; its function was justice and good conscience; it was evoked by motives of equity and fair dealing in order to prevent the inequitable enforcement of *other* rules of law. (3 Pomeroy's Equity Jurisprudence (5th ed.) § 802, pp. 180-181.) Equitable estoppel bespeaks a thirst for individualized justice, obedient to general doctrine but relatively free of servitude to fixed verbalisms. In the evolutionary dynamics of California environmental law, the plasticity of equitable estoppel has been replaced by the rigidity of the vested rights rule. Doctrinal evolution has come full circle—from the formal, unmoral rigidities of medieval common law to the individualized humanity of equity and back again to the fixed demands of the vested rights rule.

As described in *Avco* (17 Cal.3d at p. 793), the vested rights rule draws a distinction between "soft" development costs (land, options,

---

[14]In a recent description of America's most acute needs for speed and economy in dispute resolution, Chief Justice Warren Burger declared: "Ways must be found to give appropriate weight to ecological and environmental factors without foreclosing development of needed public works and industrial expansion by inordinate delays in litigation. The accommodation of the conflicting values demands that there be a swift resolution of those cases, so as to avoid the waste involved in suspending execution of large projects to which vast public or private resources are committed. This country has appropriately committed itself to protecting our environment, but we must also build needed schools, homes, and roads, and in the process provide jobs." (Address given at National Conference on the Causes of Popular Dissatisfaction with the Administration of Justice in April 1976, reprinted under the title, *The Direction of the Administration of Justice* (1976) 62 A.B.A.J. 727.)

[15]*Avco Community Developers, Inc.* v. *South Coast Regional Com.*, *supra*, 17 Cal.3d at pages 791, 795, 797-798; *Oceanic California, Inc.* v. *North Central Coast Regional Com.*, *supra*, 63 Cal.App.3d at page 70.

planning and design) and "hard" construction costs. Only the latter evoke the rule's protection. To the developer both kinds of cost represent dollars of equal hardness. The vested rights rule draws no distinction between two kinds of regulatory-administrative shifts: (a) demands emanating from new regulatory laws or changing socioeconomic conditions; (b) an administrative change-of-mind on the part of a single administrative board. Such a change-of-mind occurred here.

The vested rights rule is firmly rooted in judicial recognition of government's ongoing right to control land-use policy. (*Avco Community Developers, Inc.* v. *South Coast Regional Com., supra,* 17 Cal.3d at p. 797.) At this point, equity pauses to inquire how fairly government administers land-use policy and whether its administration is conducted with concern for the entrepreneur-applicant. "There is little good in protecting the environment for the sake of a society which fails to insist on fair treatment of its citizens." (*People* v. *Department of Housing & Community Dev., supra,* 45 Cal.App.3d at p. 200.)

To this date, the only comprehensive, environmentally guided decision accorded Raley's Northshore Mall proposal has been a favorable one. That decision has been repudiated by a state board whose members participated in it. Unlike the coastline protection decisions we have cited, the repudiation did not stem from the intervention of a new environmental control system. During the entire course of Raley's project development, the proclaimed objectives of the Tahoe regional control legislation have remained constant. The record shows no effort by the developer to evade those objectives. The prime impetus of repudiation was the 1974 reconstitution of the CTRPA board, resulting in a new majority which disagreed with the former majority. The developer's loss can be chalked up to lack of authoritativeness and finality in the state-established decisional machinery.

When and if the rigidities of the vested rights rule are tempered by heightened concern for the citizen-entrepreneur, the California Legislature may be prodded into an acutely needed redesign of environmental control mechanisms. As an intermediate appellate court, we take the statutes and the binding decisional doctrines as we find them. In their present condition, they permit Raley no judicial relief.

The judgment is reversed and the cause remanded to the trial court with a direction to enter judgment denying relief.

Puglia, P. J., and Reynoso, J., concurred.

The petition of the plaintiff and respondent for a hearing by the Supreme Court was denied July 6, 1977.