In re SAN CLEMENTE ESTATES, a California general partnership, Plaintiff,

v.

CITY OF SAN CLEMENTE, a Municipal corporation; Karoline Koester, George A. Caravalho; Thomas J. O'Keefe, William C. Mecham; and Robert D. Limberg, Defendants.

CITY NATIONAL BANK, a National Banking Association, Plaintiff-in-Intervention,

v.

CITY OF SAN CLEMENTE, et al., Defendants.

Bankruptcy No. 80-00710-K.
Adv. No. C-80-0236-P.

United States Bankruptcy Court, S. D. California.

May 19, 1981.

Robert W. Alberts, Santa Ana, Cal., for The City of San Clemente.

Keith E. McWilliams, San Diego, Cal., for debtor, San Clemente Estates.

Gary Nemer, Los Angeles, Cal., for party in intervention, City National Bank.

Donald McGrath, San Diego, Cal., for various lot purchasers.

Ralph Pray, San Diego, Cal., for Anderson and Olson.

Rudolph E. Harper, Lawndale, Cal., for various lot purchasers.

David De Lancey, Newport Beach, Cal., for H–K Development.

## OPINION

HERBERT KATZ, Bankruptcy Judge.

San Clemente Estates is a general partnership consisting of Intercoast Real Estate Development Company, Randolf Parks, Inc., a California corporation, and American Land Systems, Inc. On March 27, 1980, an involuntary petition under Chapter 11 of

the Code was filed against San Clemente Estates. An order for relief was entered on April 18, 1980.

The key asset of the debtor is approximately 188 acres of undeveloped land in the City of San Clemente, California, which is commonly known as Linda Mar Estates and Tract No. 8575. On June 24, 1980, this court confirmed a sale of Linda Mar Estates to Anderson/Olson Development and Sukut Construction, Inc., for the sum of $5,100,-000.00. The close of escrow on this sale is subject to several conditions including that San Clemente Estates obtain from the City of San Clemente a final grading permit and approval of street improvements.

The action to be determined herein was filed on June 23, 1980. After filing of the complaint City National Bank was allowed to intervene on its own behalf. Through the complaint and subsequent amendments thereto to conform to proof adduced at trial, the debtor requests that this court permanently restrain defendants from attempting to modify the subdivision agreement and from taking action to revert the property to acreage. The debtor also asks this court to issue a mandatory injunction compelling the City of San Clemente to issue a grading permit upon the debtor or its successor posting adequate grading bonds.

A trial was held on the issues, however, prior to filing this opinion Plaintiff-in-Intervention presented a notice of motion for compromise which was heard on April 22, 1981. This opinion is filed to address both the motion for compromise and the trial on the merits.

## MOTION FOR COMPROMISE

On April 1, 1981, Plaintiff-in-Intervention submitted a proposed compromise which was agreed to by the City of San Clemente. The major dispute in this case is whether the debtor should be allowed to develop Linda Mar Estates as such development was planned in 1977 or whether subsequent changes in zoning and hillside grading laws should force the debtor to substantially redesign the project before final city approval could legally be given.

The compromise provides for a substantial redesign of the property and limitations on which lots could be developed. On approximately 70 lots additional geological analysis would need to be completed before they could be developed. The compromise would also give the developer assurances that grading permits would be issued and that the property would be exempt from certain specific plan and variance requirements.

The debtor objected to the proposed compromise. However, it was stipulated that if the court found that the compromise was in the best interest of the debtor and creditors of the estate the court could enter judgment on the compromise. The compromise was also objected to by other parties in interest including prospective lot purchasers and the prospective buyer, the Anderson/Olson Group.

At the hearing on the compromise expert testimony was presented along with a detailed summary of an economic feasibility analysis of the three possible alternatives before the court. The first and second alternatives were based on either a judgment for or against the plaintiff in the underlying case. The third alternative was the proposed compromise.

Although it was suggested that the court's ruling be partly based upon its intended decision on the merits of the underlying case, these were not analyzed and decided until after a decision was reached on the application for compromise. In ruling on this motion only the facts pertinent to the compromise were considered.

The testimony of Walter Hahn, Ph.D., indicated that a developer could net between $5,405,000.00 to $7,430,000.00 if the property were developed according to the compromise. He further testified that a project is economically feasible when the projected profit is 20% of total construction costs. Using this standard the compromise development would be economically feasible. This projection is based upon a number of assumptions, which include that a

developer would be willing to undertake the project as compromised and that interest rates would substantially decrease within the next four to six years.

The nature of the testimony presented was purely hypothetical. At no time was it suggested that there was a developer in existence who would undertake the Linda Mar Estates project as compromised. In fact it was indicated that the current prospective purchaser would not undertake the development and sale of the property if the compromise was approved.

■ Under these circumstances the court cannot in all fairness approve the compromise over the debtor's objections. The compromise is not in the best interest of the debtor or creditors in that there is no assurance of any sale or development within the near future. The best interests of the estate herein can only be served by a quick sale of Linda Mar Estates. The application for compromise is therefore denied.

## TRIAL

The facts in this case are fairly complicated. In addition to the evidence presented at trial the court has also personally viewed the subject property at the request of all parties herein.

The planning for Linda Mar Estates began in 1973. On November 28, 1973, Sturtevant and Gorham, as representatives of the then owners of Linda Mar Estates, obtained a use permit under Section 4.19 of Ordinance No. 397 of the laws of the City of San Clemente. The use permit established the land use of the property for recreational and residential uses. The use permit anticipated that there would be recreational facilities, townhouses, single-family homes and 250 lots to be sold individually.

In January of 1974, hearings were held before the planning commission to further establish the use of the property and to iron out any discrepancies between city policies and the planned development. Major areas of concern were streets, sewers, drainage, grading, landscaping, fire hydrants, private streets, gated community, condominium lots, set backs, water system and park fees.

On February 6, 1974 a tentative tract map was submitted to the City Council of San Clemente however it was referred back to the planning commission for reconsideration as to conformance with the general plan. On February 19, 1974, the planning commission found Tract 8575 to be in conformance with the general plan.

On February 20, 1974, the City Council approved tentative Tract Map 8575 subject to sixteen conditions. At the hearing testimony was presented to the council which illustrated the planned private community as one with gated entrances, private streets, and R-1 lots with a minimum of 10,000 square feet to sell for approximately $35,-000.00 with restrictions requiring houses of 2,000 to 2,200 square feet to be built thereon. Also discussed were two planned public viewpoints within the tract.

On July 8, 1975, Sturtevant and Gorham requested a one year extension of the tentative tract map because of difficulty in obtaining bank financing to develop the tract. This request was denied by the City Council on July 16, 1975.

On August 13, 1975, Warren Sturtevant presented a more detailed request for extension of the tentative tract map. This request for reconsideration was also based on representations that development delay had been caused by the city's failure to decide on how to sewer the project.

On August 26, 1975, the City Council approved a one year extension of the tentative tract map. Councilmen Fox and Lane expressed reservations about extensions of time in that time limits on *tentative tracts* were provided to allow the city to review what has been approved in the past in light of what changes may have occurred in the interim. On February 18, 1976, a further six month extension was granted again because of problems with the sewer district. This extension however provided that the development would fall within the provisions of the hillside grading ordinance, the subdivision ordinance and any sewage requirements the city may have. On February 2, 1977, a further extension was granted until August 18, 1977.

In March of 1977, preliminary plans were filed and a landscape plan was submitted to the city parks planner. On July 19, 1977, the planning commission met to determine whether or not the tract complied with the hillside grading ordinance. The commission found that tentative Tract No. 8575 complied with the intent of paragraphs A and B of Section 12.2.20 and paragraphs A through E of Section 12.1.21. The plans were then returned to the parks planner for determination of compliance with Section 12.2.21, paragraphs F through L, which deal strictly with planting and irrigation. In this regard on December 19, 1977, Robert Johnston, the parks planner, advised designers for San Clemente Estates that the landscape and irrigation plans had been approved.

Meanwhile on August 2, 1977, the San Clemente engineering department received from the developers a copy of the subdivision agreement, the faithful performance bond, labor and materials bond, survey monument bond, and the sewer and street bond. Some $469,787.69 and other additional fees were paid or deposited with the city.

On August 3, 1977, the full city council approved the final map of Tract 8575 consisting of 224 lots in San Clemente. The minutes of the hearing also indicate that Sturtevant and Gorham Development Co. had submitted all required items for finalization of Tract 8575. The subdivision agreement was then executed on August 4, 1977.

If the problems of San Clemente Estates had ended here, life in general would have been beautiful. However, as fate may have it, life in the city of San Clemente was to take a turn for the worse.

In September of 1977, the debtor was assessed an additional sum of $127,383.96 for sewage work to be completed on the project. This assessment was paid.

In the meantime engineering for the project was near completion. The original design called for slopes of one and one half feet horizontal to one foot vertical. The city council had a policy of requiring maximum slopes of two feet horizontal to one foot vertical. This policy was eventually incorporated into a new hillside grading ordinance. While the hill upon which Linda Mar Estates is located is nothing close to being a mountain, the natural slopes are quite steep in about 65% of the development. The two to one slope policy led James Crosby, project engineer, to conclude that massive grading and extensive cribbing would be required unless 25% of the property could be graded at slopes of one and one half to one. On October 6, 1977, he requested permission from the city to allow the steeper grading where necessary. Based on a recommendation from the planning commission the request was denied on December 7, 1977.

James Crosby Engineers finished the grading plan and developed a cost estimate for the grading of the project in early 1978. These estimates indicated that over 3,400,-000 cubic yards of material would need to be moved to grade the project. At this point San Clemente Estates realized that it was in financial trouble. Apparently the developers had failed to obtain a detailed grading estimate before the financing for the project was finalized. Construction bids obtained in April of 1978 confirmed that the financing for the project was insufficient to build the project as planned. On March 8, 1977, an application for a grading permit was submitted to the city for approval. A special provision noted by the city was that a grading bond in the amount of $5,000,000.00 would be required. The then owners of San Clemente Estates pushed forward in hope of obtaining favorable additional financing.

In July of 1978, a question arose as to whether Sturtevant Corporation would need to comply with changes in zoning ordinance No. 397. The ordinance precluded the development of single-family residential lots on slopes greater than 30%. Based on an opinion of Mike Bartlett, the city attorney, the planning commission found that Sturtevant Corporation was not presently subject to the requirement because: 1) a conditional use permit was granted prior to application of the open space zoning district

to the subject property; 2) applicant has expended considerable sums of money in reliance on the granting and extension of various permits involved, including the conditional use permit and tentative tract map; and 3) numerous lots have been sold to third parties in reliance on the use permit.

On August 31, 1978, Howard Bensen, Public Works Director-City Engineer for the City of San Clemente, sent a letter to James E. Crosby stating that "upon receipt of the grading bond and grading fee for Tract No. 8575, the City of San Clemente, will issue the grading permit for said tract." On November 8, 1978, Howard Bensen sent a different letter to Warren B. Sturtevant which stated that "the grading permit can be issued anytime after the grading bond is posted and the grading fee is paid." The final grading plans consisting of six pages were approved and signed off by Howard Bensen on August 31, 1978.

In the meantime it appeared that problems were developing in the sales of the individual lots. Part of the problem revolves around a few dubious lot sale transactions by Donal J. Mac Adam, a principal in American Land Systems, Inc., a partner in the debtor, and the eventual action by the California Department of Real Estate to halt sales of lots in Linda Mar Estates altogether because of deviations in sales from the methods prescribed in the public report.

In addition to the inability to post the requisite grading bonds, the project was further hampered when the City of San Juan Capistrano refused to allow the proposed grading of two streets along that city's ridgeline on September 12, 1978. Thereafter a request was made to delete construction of Camino de la Manaza and the northerly 1,100 feet of Calle Agua and to terminate Calle Agua with a cul-de-sac. The San Clemente City Council approved this deletion on February 7, 1979, and the grading plans were subsequently revised accordingly. From this point on the relationship between this project and the City of San Clemente began to deteriorate.

On January 10, 1979, the present debtor became owner of the subject property by way of a quitclaim deed. While the debtor has at times referred to itself as an innocent third party purchaser it is clear that some of the integral parties who were previous owners are members of the partnership currently holding title to the property.

In July of 1979, the city council extended the subdivision agreement. However, six areas of concern were to be investigated. These included: The use permit, improvements made to date, compliance with the tentative map, the equestrian center, further geological study and participation in school and park fees. Many of the concerns of the council were brought about because of excessive problems in San Clemente involving hill slides and other erosion problems encountered after heavy rains in 1979. The council also voiced its concern for possible liability to home owners who would eventually be building on the slopes of Linda Mar Estates.

On August 1, 1979, an apparently involved hearing ended with the city council approving another extension of the subdivision agreement until August 30, 1980, on the condition that the city manager engage a geological firm for further investigation with the cost to be borne by the developer.

On March 21, 1980, Tim Paone, an attorney for and on behalf of San Clemente Estates, requested an additional extension of the subdivision agreement to February 3, 1982. The basis of the request was that money market increases in the prime lending rate would lead to unreasonably high housing costs and it was hoped that rates would stabilize within the next year or two.

The debtor at this point was facing bankruptcy and was placed under an involuntary Chapter 11 reorganization on April 18, 1980.

In the ensuing months the city council has requested additional geological reports and has voiced its concern about possible non-compliance with the current hillside grading ordinance. The current ordinance does not allow hillside developments to alter the natural ridgeline. In this regard attention has been focused on a region which has

become known as hang glider hill. This hill somewhat resembles a bump on the front side of the hill backing the entire project. From certain angles this hill provides a natural saddle ridgeline between it and the main hill. The grading plans as approved in 1978 would call for a cut of some 100 feet off the top of the hill. Although the new ordinance is partly subjective in nature there is an indication that such a cut would violate the intent of the current hillside grading ordinance.

Up until the time of trial the debtor has attempted to make every change in the plans and development that the city has asked for. In recent months however both sides have grown war weary and failed to reach agreement primarily over the problems with hang glider hill.

In light of all of the happenings in this case the city refuses to issue a grading permit on the basis that the project does not comply with the current hillside grading ordinance; a new use permit is required; a variance is required for building on slopes greater than 30% and the subdivision agreement has lapsed and therefore cannot be renewed until a new tentative map is filed.

Lastly the evidence indicates that an actual grading permit was never issued nor have building permits been applied for.

The debtor claims that the City of San Clemente is estopped from denying issuance of necessary permits to allow this project to be developed upon the posting of appropriate bonds. The debtor apparently is not seeking administrative mandamus of any particular action of the city but instead asks this court to invoke its general equitable powers to issue prohibitory and mandatory injunctions.

The power of the bankruptcy court to issue injunctions is derived from Title 28 U.S.C. § 1481 and 11 U.S.C. § 105(a). Section 1481 provides that "(a) bankruptcy court shall have the powers of a court of equity, law, and admiralty..." Section 105(a) provides that the "bankruptcy court may issue any order, process, or judgment necessary or appropriate to carry out the provisions of this title." Title 28 U.S.C. § 1471(e) provides that the "bankruptcy court in which a case under Title 11 is commenced shall have exclusive jurisdiction of all of the property, wherever located, of the debtor, as of the commencement of such case."

■ The powers of the bankruptcy court under the Code are much broader than they were under the Act. Under the Code civil cases which formerly had to be tried in state or federal court can now be tried in the bankruptcy court virtually without exception. See *In re Brothers Coal Co., Inc.*, 6 B.R. 567 (Bkrtcy.W.D.Va.1980); *Matter of Troy Indus. Catering Service*, 2 B.R. 521 (Bkrtcy.E.D.Mich.1980); 28 U.S.C. § 1481 (the bankruptcy court has limited powers to enjoin another court or punish a criminal contempt.) In land use cases involving estoppel or vested rights against a municipality the state courts have basically sat as courts of equity. See *Raley v. California Tahoe Regional Planning Agency*, 68 Cal. App.3d 965, 137 Cal.Rptr. 699 (1977). Given the broad grant of power to the bankruptcy courts by Congress this court holds that a bankruptcy court has the power to issue both mandatory and prohibitory injunctions against a municipality where the acts sought to be restrained or compelled affect property of the estate. Under what circumstances this power should be exercised is another important question.

■ A general rule has been that courts will not interfere by injunction with the exercise of discretionary powers conferred by the state upon a municipality unless the action complained of is illegal, fraudulent, or clearly oppressive such that equity will act to restrain it. 42 Am.Jur.2d § 180, p. 950. In California, the courts will not mandate the exercise of a local official's discretion in areas lawfully entrusted to the administrative agency. *Lindell Co. v. Board of Permit Appeals*, 23 Cal.2d 303, 144 P.2d 4 (1943); *Faulkner v. Cal. Toll Bridge Authority*, 40 Cal.2d 317, 253 P.2d 659 (1953). Therefore, this court cannot issue an order directing an official of San Clemente to exercise its discretion. However,

this court may compel the city to act or refrain from acting where the acts to be ordered are non-discretionary either through finality of decision or estoppel. See *City of Long Beach v. Mansell*, 3 Cal.3d 462, 91 Cal.Rptr. 23, 476 P.2d 423 (1970); *Avco Community Developers, Inc. v. South Coast Regional Com.*, 17 Cal.3d 785, 132 Cal.Rptr. 386, 553 P.2d 546 (1976).

■ It has long been the rule in California that if a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit. *Avco Community Developers, Inc., v. South Coast Regional Com.*, 17 Cal.3d 785, 132 Cal.Rptr. 386, 553 P.2d 546 (1976). A correlative and somewhat similar notion is that the doctrine of equitable estoppel may be applied against the government where justice and right require it. *City of Long Beach v. Mansell*, 3 Cal.3d 462, 91 Cal.Rptr. 23, 476 P.2d 423 (1970).

In confronting the subject of vested rights the City of San Clemente relies heavily on *Avco Community Developers, Inc., v. South Coast Regional Com.*, 17 Cal.3d 785, 132 Cal.Rptr. 386, 553 P.2d 546 (1976) and other cases which discussed vested rights under Section 27400 of the California Coastal Zone Conservation Act of 1972 (Pub.Resources Code, § 27000 et seq.). In *Avco*, supra, the builder had obtained a grading permit from the county and had secured approval of a final tract map. Grading had commenced and subdivision improvements had been installed. It appeared that the developer had expended over two million dollars and had incurred additional liabilities, however a building permit had not been obtained. The Supreme Court of California held that the developer had not acquired a vested right to complete development either at common law or pursuant to Pub.Resources Code § 27404. Such a right would have allowed the builder to proceed if it had obtained a building permit prior to a date set in the act and, in good faith, had performed substantial work in reliance

thereon. The reason for the denial of *Avco's* common law vested rights was that the county had not issued any permits which related to plans for the placement of any specific buildings. All that had been approved was zoning which would have allowed for clustering of buildings. The court therefore adopted the rule that neither the existence of a particular zoning nor work undertaken pursuant to governmental approvals preparatory to construction of buildings can form the basis of a vested right to build a structure which does not comply with the laws applicable at the time a building permit is issued. *Avco Community Developers, Inc., v. South Coast Regional Com.*, supra, 17 Cal.3d at 793, 132 Cal.Rptr. 386, 533 P.2d 546; see also *Spindler Realty Corp., v. Monning*, 243 Cal. App.2d 255, 53 Cal.Rptr. 7 (1966). The purpose of this rule is to prevent courts from issuing orders for the construction of improvements contrary to presently existing legislative provisions. *Atlantic Richfield Co. v. Board of Supervisors*, 40 Cal.App.3d 1059, 1065, 115 Cal.Rptr. 731 (1974).

A strict application of the *Avco* rule may well have been determinative of the issues in this case, however the *Avco* opinion cannot be read to require a strict application in all cases. In *Avco*, supra, it was suggested that in rare situations the government may grant another type of permit, such as a conditional use permit, which affords substantially the same specificity and definition to a project as a building permit and that in such instances the builder might acquire a vested right even though the document was not designated a building permit. The court, however, found it unnecessary to determine whether such a permit would constitute an exception to the general rule, but intimated through argument that it could be a viable result in the proper case. See *Avco Community Developers, Inc., v. South Coast Regional Com.*, supra 17 Cal.3d at 793–798, 132 Cal.Rptr. 386, 533 P.2d 546. Other cases both before and after the *Avco* decision have lent support to the proposition that in certain circumstances a building permit may no longer be the only manner of obtaining a vested right if

preliminary public permits are sufficiently definitive and manifest all final, discretionary approvals required for completion of specific buildings. *Raley v. California Tahoe Regional Planning Agency*, 68 Cal. App.3d 965, 137 Cal.Rptr. 699 (1977); *Aries Dev. Co. v. California Coastal Zone Conservation Com.*, 48 Cal.App.3d 534, 122 Cal. Rptr. 315 (1975); *Environmental Coalition of Orange County, Inc., v. Avco Community Developers, Inc.*, 40 Cal.App.3d 513, 115 Cal. Rptr. 59 (1974).

In the present case no grading or building permits have been issued. However, a use permit was issued and a final tract map was approved and recorded. The approval of a final tract map acts as a certificate that the real property complies with the applicable provisions of the Map Act and local ordinances enacted pursuant thereto. California Government Code § 66499.35(d).

At the time the use permit was issued, the planning commission knew where the development would be located, and it would include more than two hundred and fifty lots, and would include other facilities. Between the time of the issuance of the use permit and the recordation of the tract map the city council became intimately familiar with the project, including where each lot would be placed, what each lot would look like; the elevation of each lot; the type of single-family residential home required to be built on each lot; that a condominium project would be built at a specific location and that a club house and equestrian center were to be provided in specific areas. The detailed development projections for the project allowed the city to determine that a new sewer and water system would need to be provided. While the specific building plans for each home were not before the council, and will not be for some time, the information available was sufficiently specific to allow the city council to know exactly what it was approving.

█ Before a vested right can accrue there must be a determination that in reliance on issued permits the developer changed his position and expended substantial sums of money. *Raley v. California*

*Tahoe Regional Planning Agency*, 68 Cal. App.3d 965, 975, 137 Cal.Rptr. 699 (1977). In the present case the court finds that the debtor relied on the use permit, approvals of the Environmental Impact Report and recordation of a final tract map in: 1) obtaining financing; 2) posting over $500,-000.00 for city fees, deposits and assessments; 3) selling lots to third party individuals; 4) spending over $40,000.00 for additional soils and geology work; and 5) spending over $60,000.00 for additional grading and plan redesigns necessitated by city action. Additionally the city on at least two occasions publicly stated that San Clemente Estates would not be required to obtain a new use permit or a variance to build on slopes greater than 30%. Based on the foregoing, this court holds that San Clemente Estates has a vested right to complete construction of Tract 8575 as that project is specified in the final recorded tract map. Subject to the limitations placed on this project herein below, San Clemente Estates or its successor will not be subject to obtaining a new use permit or variance to build on slopes greater than 30%.

█ The only remaining questions are in regard to the grading of the project and landscape design. In the present case the design for the project was found to be in conformance with the hillside grading ordinance in effect at the time of the approval. Thereafter in 1978 the grading plans were approved and signed off. The landscape and irrigation plans were also approved. On two occasions Howard Bensen represented that the grading permits will be issued when the necessary grading bonds are posted. Based on these statements it appears that all discretionary approvals had been made except perhaps determining whether the grading bonds were issued by a sufficient surety. Because the grading and landscaping plans are an integral part of the vested rights of the debtor to build this project and the city has made very discretionary approval necessary for the issuance of the necessary permits, this court holds that the City of San Clemente is estopped from denying their issuance upon the post-

ing of a sufficient grading bond. See *City of Long Beach v. Mansell*, supra; *Aries Dev. Co. v. California Coastal Zone Conservation Com.*, supra.

The City of San Clemente argues that the grading plans have been changed substantially since the approvals were given because of the deletion of two streets. The evidence at the trial indicated that the city council approved the deletion of the streets. In practical effect the deletion does not alter the design of a single lot in the project. In fact, the deletion will actually mean less grading and further maintenance of the natural landscape of the hill. This court finds that such modifications are minor in nature and therefore do not destroy plaintiff's vested right. See *Aries Dev. Co. v. California Coastal Zone Conservation Com.*, supra at 548.

In rendering this decision the court is mindful of the dangers in applying vested rights pointed out in *Avco Community Developers, Inc. v. South Coast Regional Com.*, supra 17 Cal.3d at 797, 132 Cal.Rptr. 386, 553 P.2d 546. The court therein was concerned that if the construction of subdivision improvements or the zoning of the land are sufficient to afford a developer a vested right to build buildings on the land in accordance with the laws in effect at the time the improvements are made or the zoning enacted, there could be serious impairment of the government's right to control land use policy.

In *City of Long Beach v. Mansell*, supra 3 Cal.3d at 496–497, 91 Cal.Rptr. 23, 476 P.2d 423, the California Supreme Court stated that the "government may be bound by an equitable estoppel in the same manner as a private party when the elements requisite to such an estoppel against a private party are present and, in the considered view of a court of equity, the injustice which would result from a failure to uphold an estoppel is of sufficient dimension to justify any effect upon public interest or policy which would result from the raising of an estoppel." See also *Raley v. California Tahoe Regional Planning Agency*, supra 68 Cal. App.3d at 975, 137 Cal.Rptr. 699.

The facts in this case are such that an estoppel is necessary to prevent injustice. This project has been before the City of San Clemente now for more than 7 years. In the development planning of this project more geological testing has been performed than on any other similar project in San Clemente. Geologists agree that with minor alterations almost every lot can be made safe to build upon. The delays in bringing the project to fruition have been caused by mistakes on both sides equally. The debtor through the Anderson/Olson group is ready to proceed, however, the current city council is trying desperately to cling to what they believe is in the best interests of the community. But it is too late. The current council must accept that which has been done before them in order that injustice can be avoided as to this debtor.

This decision, however, does not go without its limitations. The City of San Clemente has a legitimate interest in protecting the safety of its citizens. As such it may set geological standards for property on which family dwellings will be placed. Although this decision gives the debtors certain vested rights it does not give them the right to build specific buildings on any lots. Before each lot owner builds he must obtain a building permit. Under this decision the city may not deny the issuance of the permit based on zoning or use regulations. The city however may require structural safeguards in the final grading of each lot and the eventual building thereon. The applicable law will be that which is in existence at the time each building permit is approved. The City of San Clemente may not unreasonably withhold the issuance of any building permit in the Linda Mar Estates project.

As additional protection for the City of San Clemente the debtor or its successor in interest will have 24 months in which to complete the grading and improvements on the project from the day this decision becomes final. If improvements and grading are not completed within such time the tract will become subject to all current city

ordinances and all vested rights will be deemed forfeited.

Wherefore, this court holds that upon the debtor or its successor in interest posting a sufficient grading bond, the amount of which is to be fixed by the City of San Clemente, the City of San Clemente shall issue a grading permit for the grading of Linda Mar Estates according to the approved plans as they existed on August 31, 1978 with the exception that Calle Aqua and Camino de la Manaza may be deleted therefrom as previously approved by the city council.

Pursuant to FRCP 52 this opinion shall constitute findings of fact and conclusions of law herein. Counsel for the debtor shall prepare an appropriate and specific order within ten days hereof.