LAKEVIEW DEVELOPMENT CORPO-
RATION, a California corporation,
Plaintiff–Appellant,

v.

CITY OF SOUTH LAKE TAHOE, a mu-
nicipal corporation; Tahoe Regional
Planning Agency, a separate legal enti-
ty created pursuant to an interstate
Compact between the States of Nevada
and California, and Does 1 through 30,
Defendants–Appellees.

No. 89–15214.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 18, 1990.

Decided Sept. 28, 1990.

Lawrence L. Hoffman, Hoffman, Lien & Faccinto, Tahoe City, Cal., for plaintiff-appellant.

Gary A. Owen, Crowell, Susich, Owen & Tackes, Carson City, Nev., Richard M. Skinner, Deputy Atty. Gen., Sacramento, Cal., for defendants-appellees.

Before LIVELY,[*] FLETCHER and REINHARDT, Circuit Judges.

FLETCHER, Circuit Judge:

Plaintiff Lakeview Development Corporation (Lakeview) appeals from the district court's entry of judgment against it on four claims, the first of which asks for a declaration that Lakeview has a "vested right" to complete the construction of a townhouse development, and the other three of which ask for injunctive relief and damages to redress the alleged deprivation of Lakeview's right to the economically viable use of its land. We affirm the district court's judgment on all four claims, albeit for reasons different from those stated by the district court.

## I.

## FACTS

In 1967, Lakeview[1] bought a four acre plot of land in South Lake Tahoe, intending to build a "planned unit development" consisting of townhouses and a hotel.

In October of 1968, Lakeview submitted an application to the City of South Lake Tahoe (City) for a special use permit (SUP). The application included a proposed subdivision map and a proposed site plan which depicted the layout of nine structures to be built on the site—eight townhouse buildings containing between two and six units each (a total of forty-two units) and one hotel containing 158 rooms. The map reflected that there were to be two clusters of townhouses, designated Unit One and Unit Two, containing eighteen and twenty-four units respectively. A swimming pool and a recreation area were also depicted. Also submitted were maps depicting among other things elevations of the buildings, floor plans, and common road and drainage facilities.

On November 27, 1968, the City Planning Commission approved the special use permit subject to four conditions and the tentative map subject to thirteen conditions. One of the four conditions of the SUP was, "All buildings, tree removal, and landscaping to be as approved by Architectural Review Committee ... such approval to be obtained prior to issuance of any individual permit for construction."

On December 3, 1968, the City Council approved the tentative map subject to the same conditions as imposed by the City Planning Commission.

The minutes of the May, 1969 City Planning Commission meeting show that development of the townhouses was intended at that time to take place in two phases; the first was to include the fourteen townhouses designated "Unit One" and the second was to include the twenty-eight townhouses designated "Unit Two." There was to be a three to six month span of time between the completion of phase one and the commencement of phase two.

On June 18, 1969 the newly-created California Tahoe Regional Planning Agency

---

[*] Honorable Pierce Lively, Senior United States Circuit Judge for the Sixth Circuit, sitting by designation.

1. Although the entity that is now Lakeview has had several different names, for convenience, we refer to it as Lakeview.

(CTRPA) approved the plan subject to the same conditions as those imposed by the City. (Appellee Tahoe Regional Planning Agency (TRPA), created by an interstate compact approved by Congress, P.L. 91–148, 83 Stat. 360, was still being formed and had not yet come into official existence. It began operations on March 19, 1970.) On November 7, 1969, the final map for Unit One was recorded. On November 17, 1970, the final map for Unit Two was recorded.

Between November of 1969 and November of 1971, Lakeview obtained building permits from the city as each Unit One structure, including the swimming pool and recreation pavilion, was built.

Almost two years later, in October of 1973, Lakeview obtained a foundation permit for the first sixplex in Unit Two. Shortly thereafter, however, it abandoned the permit and changed its construction plans. Lakeview decided to delay building Unit Two and to proceed with the development of the hotel. Nat Sinclair, one of Lakeview's principals, stated in his affidavit that he made the decision because of a "hostile regulatory environment." In other words, it was becoming clear that the California legislature was on the verge of giving CTRPA a broader mandate to control development than it had previously.[2] Sinclair felt that the hotel was more important to develop and that the sooner the construction was begun on the hotel, the greater the protection Lakeview would have against changes in the law.

Lakeview attempted to obtain a building permit for the hotel before July 12, 1974, the date CTRPA was expected to announce its new plan. Lakeview failed to do so, but it began to lay a foundation anyway—apparently on assurances that the City would later ratify the work done.

On July 12, 1974, CTRPA announced an interim plan, Resolution 74–1. That plan stated that CTRPA would review all per-

mits for certain buildings "granted [by local governments] since January 1972 for which actual construction has not commenced. For purposes of this section, construction shall constitute issuance of a building permit and completion of a foundation."

On July 24, 1974, the City granted Lakeview the foundation permit for the hotel. On July 28, Gordon Hooper of CTRPA wrote to the City Manager, stating his intention to have a "stop work" order issued because CTRPA had not reviewed the project. The City Manager wrote back, asserting that CTRPA *had* reviewed—and approved—the hotel project in 1969. CTRPA took no further action.

During the same week in July when Lakeview's foundation permit application was pending before the City, TRPA, independently of CTRPA, expressed in a letter to the City its opinion that the permit should not be granted. TRPA, it should be recalled, did not exist when the special use permit was obtained in 1969. When TRPA began operations, it passed an ordinance requiring all developers to obtain administrative permits from TRPA before building. Section 9.11 of that ordinance, subsequently renumbered as § 9.10, contained a grandfather clause exempting certain developments from the administrative permit requirement. The clause provided:

> Uses of land ... that do not conform to the regulations established by this Ordinance and ... which are to be created in connection with a subdivision the final map of which was approved by the appropriate local government ... within five years prior to February 10, 1972 are non-conforming uses [that may be continued], *provided, however,* in the case of a ... use to be created, it shall occupy no greater area than planned at the time such subdivision was approved. If any such use ceases for a period of one year, subsequent use of such land shall be in conformity with the regulations contained in this Ordinance.

**2.** *See* Cal.Govt.Code § 67041.

The City responded to TRPA's letter with its own letter stating that it intended to issue the foundation permit. The City's letter, without specifically referring to the grandfather clause, pointed out to TRPA that a series of approvals were obtained by Lakeview "prior to the initiation of regulatory measures" by TRPA and that pursuant to such approvals, "work was begun on the project." The City seemed to be referring to the work done on Unit One, but the reference is not entirely clear. In any event, the City's letter to TRPA, like its letter to CTRPA, proved effective. TRPA did not pursue its objection to the hotel construction. The parties speculate that TRPA did not pursue its objection because of the grandfather clause. That, however, is not entirely clear. TRPA may simply have chosen not to fight a particular battle notwithstanding the fact that it felt the hotel was not grandfathered.

Because of problems with financing, the hotel project proceeded exceedingly slowly. Several years after construction began, only about a quarter of the structure was built. In 1979, Lakeview sold the hotel to another group, and that group eventually finished building it, but only after protracted litigation with CTRPA, which commenced in 1982. That litigation ultimately ended in a settlement, under which both parties (neither of them parties to this lawsuit) agreed that the result would not prejudice them in other cases.

In 1980, TRPA was reconstituted pursuant to extensive amendments to the Interstate Compact. *See* P.L. 96–551, 95 Stat. 3233; Cal.Govt.Code §§ 68000 *et seq.;* Nevada R.S. §§ 277.190 *et seq.*

Between May, 1974 and the summer of 1981, Lakeview had done virtually nothing to proceed with the development of Unit Two. In the summer of 1981, Lakeview contacted City officials about obtaining building permits for Unit Two. The City said that it was willing to grant the permits, but only with the consent of TRPA. The City noted that one condition of its own still had to be met—architectural review approval. In September of 1981, a TRPA attorney wrote Lakeview's lawyer that his client should seek a vested rights ruling from TRPA to determine if Lakeview was entitled to build Unit Two. Without such a determination, TRPA would not allow Unit Two to be built absent its further review of the project.

More than two years passed, and no administrative proceeding was brought to determine vested rights. On May 1, 1984, TRPA became subject to a temporary restraining order (TRO), which on August 9 became an injunction, prohibiting it from approving *any* developments, except in "circumstances of imminent threat to public health, safety, and welfare." The appellees do not raise a claim of laches with regard to Lakeview's failure to seek a vested rights determination prior to May 1, 1984.

This lawsuit was filed on July 12, 1985. The appellees concede that during the period of the TRO and injunction (May 1, 1984 to July 15, 1987), an attempt by Lakeview to exhaust its vested rights remedies by applying to TRPA would have been futile. They concede as well that under TRPA's new post-injunction plan, there is no possibility that TRPA could review its vested rights claim.

Lakeview's first claim asks for a declaratory judgment that it has a vested right to develop Unit Two without further intervention by TRPA. Its second claim asks for an injunction preventing TRPA from imposing its land use restrictions on the land planned for Unit Two, because such imposition would deprive it of all economically viable use of its land in violation of the fifth and fourteenth amendments to the United States Constitution. The third claim asks for damages resulting from the taking of all economically viable use of the land without just compensation. The fourth claim is essentially the same as the third, except that it seeks damages under 42 U.S.C. § 1983 for a deprivation of property without due process.

The district court decided the first two claims against Lakeview on summary judgment and the last two on a motion to dismiss pursuant to *Jacobson v. Tahoe Regional Planning Agency*, 566 F.2d 1353 (9th Cir.1977). Lakeview appeals all four adverse determinations.

## II.

## DISCUSSION

### A. *The Vested Rights Claim*

A number of cases in California[3] and in other jurisdictions[4] hold that if a government agency grants a real estate developer formal permission to build a particular project and the developer incurs certain kinds of expenses in reliance on that permission, the developer may acquire a "vested right" to complete the project as approved—even if the completed project would violate more stringent land use laws passed since the time permission was granted. This case raises the questions of what kind of formal government permission suffices to meet the first requirement of a "vested right" and what the scope of such a right is assuming it attaches. Before we analyze these questions, we first consider whether state or federal law governs.

■ Lakeview argues that the question whether it has a "vested right" to complete its project is a question of federal law and that this court may therefore ignore state court decisions to the extent it finds their reasoning unpersuasive. It argues first that because the vested rights doctrine limits the state's power to interfere with property rights, the doctrine has federal Constitutional implications and requires federal courts to fashion their own rules. Lakeview argues second that even if its vested rights claim does not implicate the Constitution, it implicates the Interstate Compact

between California and Nevada and that therefore this court may create federal common law to decide the claim. Both arguments lack merit.

Lakeview acknowledges that the "vested rights" doctrine traditionally has been treated as a doctrine of state law and that the doctrine has evolved in the state courts. Nonetheless, Lakeview argues that the case of *Nollan v. California Coastal Commission*, 483 U.S. 825, 833–34 n. 2, 107 S.Ct. 3141, 3146 n. 2, 97 L.Ed.2d 677 (1987), changed the framework for analyzing the issue, and that in the wake of *Nollan*, we may depart from the California cases. Lakeview relies in particular on footnote 2 of *Nollan*, where the Court, in responding to Justice Brennan's dissent, said that "the right to build on one's own property—even though its exercise can be subject to legitimate permitting requirements—cannot remotely be described as a 'government benefit.'" Lakeview argues that the reference to building on one's property as a "right" and not a "benefit" is somehow inconsistent with the doctrine that a "right" to build a *particular project* vests only after substantial work is performed in reliance on a government permit.

■ There are two difficulties with this argument. First, the *Nollan* case dealt only with a property owner's right to build a single-family house, traditionally among the most minimally-regulated uses.[5] Second, and more important, the *Nollan* court's reference to a landowner's abstract "right" to build in no way suggests that a landowner has an unconditional right under the taking or deprivation clauses[6] of the federal Constitution to build any particular project he chooses. The sentence quoted from the *Nollan* footnote is qualified by its reference to "legitimate permitting requirements." The footnote does not imply that a permitting requirement is "illegitimate"

---

**3.** *See, e.g., Avco Community Developers, Inc. v. South Coast Regional Commission,* 17 Cal.3d 785, 132 Cal.Rptr. 386, 553 P.2d 546 (1976).

**4.** *See* 49 A.L.R.3d 13 (1973).

**5.** *See* Cunningham and Kremer, *Vested Rights Estoppel, and the Land Development Process,* 29 Hastings L.J. 625, 636 & nn. 42–43 (1978).

**6.** The fifth amendment to the United States Constitution provides in relevant part: "No person shall be ... deprived of ... property without due process of law; nor shall private property be taken for public use, without just compensation."

simply because it disallows a previously permitted use. It is well established that there is no federal Constitutional right to be free from changes in land use laws. *See, e.g., Haas v. City and County of San Francisco,* 605 F.2d 1117, 1120 (9th Cir. 1979); *Traweek v. City and County of San Francisco,* 659 F.Supp. 1012, 1026 (N.D.Cal.1984) ("[P]laintiffs bought into a heavily regulated situation and were on notice that ... [t]heir purchase of property ... was therefore necessarily 'subject to further legislation upon the same topic.' *Veix v. Sixth Ward Building and Loan Association,* 310 U.S. 32, 38, 60 S.Ct. 792, 795, 84 L.Ed. 1061 (1940)"). A claim brought under the federal Constitution charging the taking or deprivation of property thus cannot be premised solely on the charge that the government has repealed a law and revoked a once valid permit.

■ In contrast to a taking or deprivation claim, the gravamen of a "vested rights" claim is that the landowner has a right to a particular use of his land because he has relied to his detriment on a formal government promise (in the form of a permit) stating that he can develop that use. The claim is thus a species of governmental estoppel. *Raley v. California Tahoe Regional Planning Agency,* 68 Cal.App.3d 965, 985, 137 Cal.Rptr. 699, 712 (1971). A claim of estoppel against the government rests not on Constitutional norms of fairness but on broader norms of equity. *Id.; see also Watkins v. United States Army,* 875 F.2d 699, 706 (9th Cir.1989) (en banc) *petition for cert. filed,* 58 U.S.L.W. 3771 (U.S. May 21, 1990) (No. 89–1806), (equitable estoppel against the government is a "nonconstitutional ground" for relief). Since no federal constitutional or statutory law requires the states to recognize *any* doctrine of governmental estoppel, let alone a doctrine with the particular contours that Lakeview urges us to recognize, we must reject Lakeview's suggestion that federal law governs the issue of vested rights.

■ Lakeview argues that even if federal law does not generally govern the question of vested rights, federal law nonetheless applies in this case because the case arises under the Interstate Compact between Nevada and California. In *California Tahoe Regional Planning Agency v. Jennings,* 594 F.2d 181, 190 (9th Cir.1979), we held that by approving the Compact, "Congress did no more than incorporate the agreement of the two parties into the body of federal law; it did not make applicable the entire panoply of federal administrative and substantive standards." We therefore must look to the laws of Nevada and California to resolve the question before us. If there were a conflict between California and Nevada law on the question of vested rights, this case would be more difficult. We would have to decide whether to apply the law of the jurisdiction where the land is situated and the permit was granted or whether to apply some other principle to resolve the conflict. But there is no conflict here. Nevada follows California law on vested rights. *See Kings Castle v. Washoe County Bd. of Com'rs,* 88 Nev. 557, 502 P.2d 103 (1972). We therefore apply state law to Lakeview's claim.

The seminal case on vested rights is *Avco Community Developers, Inc. v. South Coast Regional Commission,* 17 Cal.3d 785, 132 Cal.Rptr. 386, 553 P.2d 546 (1976) (Mosk, J.). In *Avco,* a large real estate developer, plaintiff Avco, had submitted a subdivision map to the county setting forth a plan for a certain 74–acre parcel. The map indicated that the 74 acres would be divided into 27 parcels and that multi-residential structures would be built on those parcels. The county approved the map and a rough grading permit, which did not refer to grading for any specific building site. Avco, pursuant to the county permits, built storm drains, culverts, street improvements, utilities and similar facilities. After the developer had spent over two million dollars on these improvements, California passed a major

reform of zoning laws for lands in the coastal zone. The new law required approval from the Coastal Commission for certain projects, such as Avco's. Avco contested the application of the new law to its project, claiming it had a vested right to complete the project. The court denied Avco's claim.

The court stated the general rule as follows: "[I]f a property owner has performed substantial work and incurred substantial liabilities in good faith reliance upon a permit issued by the government, he acquires a vested right to complete construction in accordance with the terms of the permit." 132 Cal.Rptr. at 389, 553 P.2d at 549. In Avco, the court addressed the question of what qualified as a "permit" [7] for the purposes of this rule, and in so doing addressed as well the general principles that inform the vested rights doctrine.

Prior to the Avco decision, California's lower courts had held that to obtain a vested right to complete the construction of a particular project, the landowner had to obtain a "building permit." See Avco, 17 Cal.3d at 792–93, 132 Cal.Rptr. at 390–91, 553 P.2d at 550–51 (discussing the rule of Spindler Realty Co. v. Manning, 243 Cal. App.2d 255, 53 Cal.Rptr. 7 (1966)). In Avco, the developer argued that the building permit rule should not apply to larger development projects when the developer has subdivided the land and installed subdivision improvements pursuant to governmental authorization. It pointed out that the building permit is issued late in the development process, often after the developer has performed a great deal of work on the land in reliance on more preliminary approvals. To allow the government to reverse itself at that late a point, argued the developer, would lead to the waste of resources on uncompleted projects and an unnecessary increase in the costs of building housing due to the excessive risks involved.[8]

The defendant Coastal Commission in Avco conceded to the court that in the context of larger development projects, it did not believe there should be an absolute requirement that the document relied on be designated a "building permit" in order for the developer to obtain a vested right. The Commission stated that if another kind of permit, such as a "conditional use permit," afforded substantially the same specificity and definition to a project as did a building permit, such a permit should suffice. 17 Cal.3d at 793–94, 132 Cal.Rptr. at 391. A "conditional use permit" is another name for a "special use permit," which is what Lakeview has obtained in this case.

The Avco court did not decide the question whether it would recognize an exception to the building permit rule; rather it held that even if an exception were appropriate, the permits relied on by Avco were insufficient because the permits did not relate to "identifiable buildings," and because maps and plans submitted to the county government did not advise the county of such "elementary details as the dimension, height ... or placement of the buildings to be built on the tract." 17 Cal.3d at 794, 132 Cal.Rptr. at 392. This rule requiring specificity recognizes that since the grant of a vested right to develop a given tract of land takes away power

7. In the course of a development project, a builder must often obtain several different kinds of permits from the government; the larger and more complex the project, the more approvals are required. Developments involving more than one structure, such as the ones at issue both in Avco and in this case, require the developer to submit progressively more specific maps and plans for government approval. The application for a building permit is the last and most specific item the developer must submit for approval before commencing construction on a particular building. The building permit application includes detailed construction plans that are reviewed to ensure compliance with, among other things, building safety codes. Since each structure in a large development project may be different, each requires its own set of construction plans and its own building permit. The normal practice of developers is to apply for each building permit just before beginning the construction of the particular building to which the permit applies, since building permits are valid only for a relatively short time.

8. For an elaboration on this argument, see generally Cunningham and Kremer, Vested Rights, supra n. 5.

from the government to control the use of the land, it is fitting that in exchange for yielding that power, the public know the facts concerning the approved use.

Although the court did not definitively decide whether it would recognize an exception to the building permit rule, it stated that its conclusion was "not founded upon an obdurate adherence to archaic concepts inappropriate in the context of modern development practices nor upon a blind insistence on a document entitled 'building permit.'" 17 Cal.3d at 797, 132 Cal.Rptr. at 394. The court thus left open the question whether a "special use permit," if sufficiently specific, could form the basis of a vested right claim, but the language it used strongly indicates how it would answer the question.

While the court suggested that it would not necessarily insist on a "building permit" as a prerequisite to a vested right, it also suggested that if it were to broaden the class of permits on which developers could rely, it would then have to guard against the dangers of a too broad expansion of the vested rights doctrine:

> If we were to accept the premise that the construction of subdivision improvements or the zoning of land for a planned community are sufficient to afford a developer a vested right to construct buildings on the land in accordance with the laws in effect at the time the improvements are made or the zoning enacted, there could be serious impairment of the government's right to control land use policy. In some cases, the inevitable consequence would be to freeze the zoning law applicable to a subdivision or planned unit development as of the time the events occurred.

17 Cal.3d at 797, 132 Cal.Rptr. at 394.

The district court in this case, in denying the defendants' motion to dismiss, initially held that a building permit was not required, but then in granting summary judgment, reversed itself and held that under California law, a building permit was indeed required. The court then held that under the rule of *Courthouse Plaza Company v. City of Palo Alto*, 117 Cal.App.3d 871, 173 Cal.Rptr. 161 (1981), a developer cannot establish that it has a vested right to complete a given project by showing only that it has performed work pursuant to a permit granted for a different project. It therefore concluded that since Lakeview had performed no construction pursuant to a building permit on Unit Two, it had no vested right to build Unit Two. In addition, the district court found that the Unit Two townhouses, the Unit One townhouses, and the hotel did not constitute an interdependent, unitary project.[9]

Lakeview makes a number of contentions on appeal. It argues that the district court erred in holding that California law requires strict adherence to the "building permit" rule. It argues further that under a rule allowing an exception for sufficiently specific "special use permits," its claim would withstand summary judgment. It argues that there is a genuine factual dispute concerning whether Unit Two is a unitary, interdependent project and that the district court's resolution of the issue was therefore improper on summary judgment.

In light of the *Avco* court's disapproving reference to "blind insistence" on the building permit rule, we are hesitant to affirm the district court's judgment based on the invocation of that rule.[10] We as-

---

9. Under the district court's rationale this finding was unnecessary, since according to the building permit rule, it does not matter how closely related a particular building is to the rest of the project; if no building permit has been obtained for that building, no right attaches. *See Leroy Land Dev. v. Tahoe Regional Planning*, 543 F.Supp. 277 (D.Nev.1982).

10. The California lower courts have given conflicting signals on the continuing vitality of the

strict "building permit" rule. *Compare Billings v. California Coastal Comm'n*, 103 Cal.App.3d 729, 735, 163 Cal.Rptr. 288, 291 (1980) (suggesting in dicta that building permit "may no longer be the *sine qua non* of a vested right") *with South Cent. Coast Regional Comm'n v. Charles A. Pratt Const. Co.*, 128 Cal.App.3d 830, 845, 180 Cal.Rptr. 555, 563 (1982) (suggesting opposite).

sume, without deciding, that the California Supreme Court would recognize an exception to the rule in the case of sufficiently specific special use permits. We also assume, without deciding, that the special use permit that Lakeview received in 1969 was sufficiently specific to meet the requirements of the *Avco* decision.[11] For even if we were to decide these issues in favor of Lakeview, its claim to a vested right would still fail, because it did not act expeditiously enough in proceeding with the development of the Unit Two townhouses.

In *Avco*, the court said that if it were to accept the premise that a vested right could attach prior to the grant of a building permit, "evils" would result. 17 Cal.3d at 798, 132 Cal.Rptr. at 394. The court offered the following hypothetical to illustrate its point:

> [L]et us hypothesize that because of mounting costs, decreasing demand, or innumerable potential other causes, Avco does not build multiple residential units on tract 7479 for a number of years. If we were to accept [the developer's] premise, the tract would be exempted not only from the current requirements of the Act, but from all zoning laws enacted for an indefinite period in the future. It is no response to those inherent evils to assert that this builder presently intends to construct its multiple residential units expeditiously.

*Id.*

In this case, even though Lakeview told the City that it intended to build the Unit Two townhouses within six months of completing Unit One, Lakeview chose not to develop the Unit Two townhouses on schedule. Unit One was completed in 1971. Lakeview then waited almost three years before it began any further construction on the development. In 1974 it decided to build the hotel instead of the townhouses. We may assume that Lakeview's decision to depart from its initial plan and build the townhouses after building the hotel would

have been immaterial had Lakeview been able to complete both projects in the time anticipated for both, but Lakeview's delays in building the hotel caused the project to drag on even longer. Lakeview has offered no evidence that any governmental agency placed obstacles in its way to developing its project expeditiously until 1981, when Lakeview first indicated it was ready to build the Unit Two townhouses. By that time twelve years had elapsed since the time Lakeview had received its special use permit. In 1969, it could not reasonably have been expected that the land on which Unit Two was to be built would still be undeveloped in 1981. In these circumstances, for Lakeview to argue that the expenditures it has made on Unit One and the hotel in reliance on the 1969 permit entitle it to a vested right for Unit Two is for it to argue in effect that its right to develop Unit Two is vested forever. Yet such a permanent vesting is the evil that the *Avco* court said that it would not tolerate. It matters not that Unit Two may have been conceived of as a dependent part of a planned unitary development. The rationale for departing from the "building permit" rule as applied to such developments is that preliminary development expenses are high and cannot be recouped if the government prohibits development before a sufficiently substantial portion of the project is completed. When, as in this case, the government does not interfere until well after the time the developer could have completed the entire project, the reason for recognizing a vested right evaporates.

The California courts have recognized that the law of vested rights must balance two conflicting interests: the public interest in lower construction costs that result from providing developers a fair degree of certainty about their investments; and the public interest in controlling pollution and congestion effectively. *See Avco,* 17 Cal.3d at 788, 132 Cal.Rptr. at 388; *Raley v. California Tahoe Regional Planning Agency,*

---

11. Making this assumption frees us from deciding whether Lakeview's failure to obtain architectural review approval for the Unit Two townhouses would defeat its claim on the ground

that it failed to obtain final discretionary approval. *See Tosh v. California Coastal Comm'n,* 99 Cal.App.3d 388, 394–95, 160 Cal.Rptr. 170, 173–74 (1979).

░░░░░░  **1299**

68 Cal.App.3d 965, 975–76, 137 Cal.Rptr. 699, 708 (1977). As we have noted, the vested rights doctrine draws on the governmental estoppel principle to achieve the balance. In *Avco*, the court held that it would not estop the government from prohibiting a development about which the developer had provided incomplete information. In *Oceanic California, Inc. v. North Central Coast Regional Com'n*, 63 Cal. App.3d 57, 67, 133 Cal.Rptr. 664, 670 (1976), the court held that ("the scope of the development which the developer has a right to complete ... is limited by the scope of the specific development theretofore approved and permitted"). It follows from these decisions that the developer should not be able to estop the government when the project temporally exceeds the scope of that approved. In other words, a government's commitment to a "planned unit development" is necessarily conditioned on the developer's proceeding at a pace reasonably close to that contemplated at the time the project was approved. If the public is to be deprived of its power to control pollution and other problems caused by overdevelopment, it should be deprived only to the extent necessary to ensure private parties a reasonable degree of certainty about the legal status of their investments.

In this case, given the scope of the project and its expected duration at the time it was approved, Lakeview may not assert estoppel against the Tahoe governments. Construing the facts submitted most favorably to Lakeview, we hold that a rational trier of fact would be compelled to conclude that Lakeview did not proceed at a pace even reasonably close to that antici-

pated. Summary judgment was therefore appropriate on the vested rights claim.[12]

## B. *The Remaining Claims*

░░░ Lakeview's second claim asks for an injunction to prevent TRPA from imposing any further permitting restrictions on its property on the grounds that such restrictions would constitute an unconstitutional deprivation of property. The claim[13] reiterates the allegations in the vested rights claim adding only the conclusory allegation that the refusal to allow the development of townhouses deprives Lakeview of all economically viable use of its land. This additional allegation purports to take the claim out of the realm of the state law vested rights doctrine and into the realm of the federal Constitution's prohibition against deprivations of property without due process of law. Even though we read them most sympathetically to the pleader, Lakeview's complaint and affidavits fail to make out a claim. "Under [Fed.R.Civ.P.] 56(c), the motion for summary judgment should have been granted in [defendant's] favor if the amended complaint and affidavits showed that there was no genuine issue as to any material fact and that appellees were entitled to a judgment as a matter of law." *Ellis v. Carter*, 291 F.2d 270, 275 (9th Cir.1961). We are "free to affirm on any ground supported by the record, provided the parties have an opportunity to discuss it in their briefs." *Paskaly v. Seale*, 506 F.2d 1209, 1211 n. 4 (1974). Although the district court granted summary judgment against Lakeview *sua sponte* on the second claim and did not make clear its grounds for so doing, Lakeview has fully discussed the claim in its briefs.

12. Lakeview also asserts a claim to what it calls a "statutory vested right" in former TRPA Land Use Ordinance § 9.11 (subsequently renumbered § 9.10), the grandfather provision quoted *supra* in section I of this opinion. This claim utterly lacks merit. It is well established that a vested right claim cannot be based on a general zoning ordinance. *HFH, Ltd. v. Superior Court of Los Angeles County*, 15 Cal.3d 508, 516, 125 Cal.Rptr. 365, 370, 542 P.2d 237, 242 (1975) ("landowners have no vested right in existing or anticipated zoning ordinances").

13. The claim reads in relevant part:
   As a result of Defendants' refusal to allow completion of construction of the Townhouses, and as a result of the overly stringent land use restrictions which TRPA currently seeks to impose *to prevent Plaintiff from completing construction of the project*, Plaintiff has been deprived of the entire practical, substantial, viable ... economic ... use of its property without due process of law in violation of the Fifth and Fourteenth Amendment.
   (Emphasis ours).

■ Lakeview's complaint asserts a constitutional right to build the precise project it proposed in 1969. As we noted in *Hoehne v. County of San Benito*, 870 F.2d 529, 532–33 (9th Cir.1989), "The Supreme Court has recognized that land-use planning is not an all-or-nothing proposition. A government entity is not required to permit a landowner to develop property to the full extent it may desire. Denial of the intensive development desired by a landowner does not preclude less intensive, but still valuable development." Lakeview makes no allegation that it has attempted to ask TRPA for a less intensive use of its land, nor does it allege that such an attempt would be futile. The complaint is thus defective under *MacDonald, Sommer & Frates v. Yolo County*, 477 U.S. 340, 353, 106 S.Ct. 2561, 2568, 91 L.Ed.2d 285 (1986). Moreover, it is clear from Lakeview's submissions that it has not been denied all economically viable use of its land and that its reasonable investment backed expectations have not been upset. *See Penn Central Transp. Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978); *Moore v. City of Costa Mesa*, 886 F.2d 260, 263 (9th Cir.1989). Lakeview bought the land in question in 1967 for one million dollars. Since then, it has constructed fourteen townhouses on the property, and it and its successors have built a 160–unit hotel, as well. Of the 200 units Lakeview initially wanted to build, only 28 will not be permitted. We have upheld far more drastic curtailments of land uses. *See, e.g., Haas v. City and County of San Francisco*, 605 F.2d 1117, 1119–20 (9th Cir.1979). In *Haas*, the landowner purchased property zoned in an area with a height limit of 300 feet and obtained a permit to build. Subsequently, the land was rezoned to restrict the construction of buildings higher than 40 feet, which restric-

tion caused the land to diminish in value from two million dollars to one hundred thousand dollars. Since Lakeview's own submissions make clear that the defendants' refusal to allow Lakeview to complete the project has not deprived Lakeview of all economically viable use of the land, we affirm the grant of summary judgment on the second claim. As the appellees argue in their brief, the claim is essentially a reiteration of the vested rights claim "dressed up" as a constitutional claim.

The third and fourth claims ask for money damages for the deprivation of property without due process. The district court dismissed them on the authority of *Jacobson v. Tahoe Regional Planning Agency*, 566 F.2d 1353 (9th Cir.1977), *rev'd in part on other grounds sub nom. Lake Country Estates, Inc. v. Tahoe Regional Planning Agency*, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). In light of the Supreme Court's decision in *First English Evangelical Lutheran Church*, 482 U.S. 304, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987), *Jacobson* is no longer good law. *See Tahoe–Sierra Preservation Council, Inc. v. Tahoe Regional Planning Agency*, 911 F.2d 1331, (9th Cir.1990) (as amended). Nonetheless, the claims are identical to the second claim in that the only injury they allege is Lakeview's inability to complete the project. We therefore find them deficient for the same reasons we find the second claim deficient.

## CONCLUSION

The judgment is AFFIRMED.