HAMILTON, Circuit Judge,
concurring in part and dissenting in part.
I agree with my colleagues that plaintiff Bettendorf has no viable due process claim here, and I join those portions of Judge Bauer’s opinion. I respectfully dissent, however, from my colleagues’ decision to affirm the dismissal of plaintiffs takings claim under state law.
The majority’s decision gives our court’s approval, on bare pleadings, to a rare and extraordinary burden on property rights. The majority is saying that a local government can first designate a lawful use of property, allowing a property owner to make substantial investments in the property and to use it that way for more than 20 years, and then state courts, at the request of the local government, can suddenly outlaw the continued use without compensation for the property owner.
To review the key facts, first, the plaintiff began using his land for a commercial use that was not then authorized by county zoning laws. The county could have taken enforcement action against him then but chose not to do so. Instead, at plaintiffs request, the county amended the zoning to allow commercial use of the property. In an unusual step, the county limited the commercial zoning designation to the period of plaintiffs ownership of the property, but it was clear that plaintiff was legally allowed to continue the commercial use as long as he owned the property and did not assign the commercial use to anyone else. The plaintiff relied on that change in the law and invested several hundred thousand dollars to take advantage of the new zoning. When the plaintiff filed a lawsuit in state court to remove the limitation to his own ownership of the property, he claims that the county went so far as to assert that he should be fined for his operation of a commercial enterprise on the property for the preceding 20 years. The state courts eventually concluded that the entire ordinance and special use permit were void, so that continued commercial use is now deemed illegal. The plaintiff can no longer use his property as he has lawfully used it since the zoning change in 1985.
The takings analysis here should be straightforward. I agree with my colleagues that there is no apparent difference between federal and Wisconsin state takings analysis, so I draw on both sources of law in trying to predict how the Wisconsin Supreme Court would apply the law here. Plaintiff Bettendorf has what courts sometimes call “vested rights” — and more recently call “investment-backed expectations” — in his continued use of the property in a way that has been lawful for many years, and in which he made substantial *429 investments. The loss of those vested rights and investments through a retroactive change of the zoning ordinance should be a compensable taking.
My colleagues dispose of Bettendorfs takings claim with a single footnote dedicated to the vested rights issue. They criticize plaintiff for referring “only vaguely” to his vested rights argument. Ante at 425 n. 2. I disagree. The argument seems to me to be presented adequately. The unfairness of the change in the local law, upsetting plaintiffs reasonable reliance and undermining his substantial investments, is palpable and obvious. It does not take an elaborate argument to put the issue squarely before a state or federal court. In other words, there is no need for a separate “vested rights” claim under federal law or state law. The concept can be understood as simply part of the regulatory takings claim that plaintiff has asserted under Wisconsin law.
The label “vested right” is a shorthand and conclusory label in property law for important property rights resulting from prior transactions, contracts, and uses of property. The concept has a long and winding history as an integral part of American property law, from the earliest days of the union. See, e.g., Vanhorne’s Lessee v. Dorrance, 2 Dall. 304, 311, 1 L.Ed. 391 (C.C.D.Pa.1795) (“It is immaterial to the state, in which of its citizens the land is vested; but it is of primary importance, that, when vested, it should be secured, and the proprietor protected in the enjoyment of it. The constitution encircles, and renders it an holy thing.”); Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 135, 3 L.Ed. 162 (1810) (“When, then, a law is in its nature a contract, when absolute rights have vested under that contract, a repeal of the law cannot devest those rights.”); Wilkinson v. Leland, 27 U.S. (2 Pet.) 627, 658, 7 L.Ed. 542 (1829) (“We know of no case, in which a legislative act to transfer the property of A. to B. without his consent, has ever been held a constitutional exercise of legislative power ... On the contrary, it has been constantly resisted as inconsistent with just principles, by every judicial tribunal in which it has been attempted to be enforced.”).
The concept of vested rights has not had just a single home in the law. It has evolved primarily as a doctrine of state common law or constitutional law, and it also can be embodied in state and local zoning and similar statutory schemes. See, e.g., Bickerstaff Clay Products Co. v. Harris County, 89 F.3d 1481, 1487 (11th Cir.1996) (doctrine of vested rights applied by district court derived from doctrine of equitable estoppel); Lakeview Development Corp. v. City of South Lake Tahoe, 915 F.2d 1290, 1294-95 (9th Cir.1990) (vested rights doctrine was concept of state law, a species of government estoppel); Lake Bluff Housing Partners v. City of South Milwaukee, 197 Wis.2d 157, 540 N.W.2d 189 (1995) (detailing the concept of vested rights in Wisconsin law); Wis. Stat. § 59.69(10)(a) (prohibiting new zoning ordinances from interfering with existing lawful uses).
As a concept in federal constitutional law, vested rights emerged long before the Supreme Court recognized regulatory takings under the takings clauses of the Fifth and Fourteenth Amendments. See, e.g., In re Taylor, 102 F. 728, 730 (7th Cir.1900) (noting that if appellant had vested right in property in question, it could not be taken away without due process and a hearing in court); City of Chicago v. New York, C. & St. L.R. Co., 216 F. 735, 738 (7th Cir.1914) (“And of course a vested property right cannot be taken away without just compensation or due process of law.”), citing Grand Trunk W.R. Co. v. South Bend, 227 U.S. 544, 33 S.Ct. 303, 57 L.Ed. 633 (1913); *430 Chicago Title & Trust Co. v. Bashford, 120 Wis. 281, 97 N.W. 940, 941 (1904) (devesting of vested right in property would violate due process clause of Fourteenth Amendment). Vested rights were long thought of as part of due process analysis, which can produce some confusion. Was the theory some form of substantive due process? And if not, how could more procedure justify the loss of those rights? Also, the “vested right” label has been ambiguous in at least one important respect. Are vested rights untouchable under any circumstances, or can the government interfere with them as long as it pays just compensation? But the concept of vested rights has migrated at least in part — perhaps it is still migrating — in constitutional law to the modern jurisprudence of regulatory takings, where it fits much more neatly. The government can take away the vested right, but only if it pays just compensation.
Under modern regulatory takings cases, whether a regulatory change interferes with the existing, lawful use of the property is a critical consideration in determining whether a compensable regulatory taking has occurred. See Penn Central Transportation Co. v. City of New York, 438 U.S. 104, 136, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (existing use of property was a consideration in evaluating whether there was a taking in seminal regulatory takings case). Let’s take those elements one at a time.
First, plaintiffs commercial use has been lawful, at least since the 1985 amendment to the zoning ordinance. We should take for granted in American law that a property owner should be able to rely on the facial validity of local zoning ordinances. A property owner should be able to invest his or her own money, and lenders and investors should be able to take risks as well, based on compliance with the face of the local ordinances. It should not be necessary to test the validity of those ordinances in court before those investments can be made with confidence.
The lawfulness of plaintiffs commercial use distinguishes this case decisively from two cases cited by the majority that rejected vested rights claims when local governments took action to end uses of property that had been illegal. See General Auto Service Station v. City of Chicago, 526 F.3d 991, 1002 (7th Cir.2008) (sign painted on side of building had been illegal for many years, and unlawfulness prevented owner from having acquired vested rights in use under state law); Petra Presbyterian Church v. Village of Northbrook, 489 F.3d 846, 848-49 (7th Cir.2007) (church did not acquire vested right by using warehouse illegally as church). In both cases, we rejected vested rights claims by distinguishing between prior uses that were legal and those that were illegal. These cases do not undermine Bettendorfs takings claim based on rights having vested in his prior legal use of his property.
Second, plaintiff has actually been making commercial use of the property since the 1985 amendment to the zoning ordinance. In regulatory takings jurisprudence, the fact that a regulatory change prohibits what had been an actual, lawful use ought to be decisive in the vast majority of cases, and probably including plaintiff Bettendorfs case.
That much is clear under the three-part test derived from Perm Central and Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust, 508 U.S. 602, 644-46, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993). The three factors are (1) the nature of the government action, (2) the severity of the economic impact on the owner, and (3) the degree of interference with the owner’s “reasonable investment-backed expectations.” First, the nature of *431 the government action in this case is a prohibition on what had been a lawful, established use. (In one of the puzzling aspects of this case, the sparse record here does not show any particular government interest that is served by prohibiting commercial use of plaintiffs property.) Second, the severity of the economic impact on the owner is difficult to gauge on the pleadings, but we should assume that it is substantial. Several hundred thousand dollars of investments will lose or have already lost much or perhaps all of their remaining value. (The bare pleadings do not provide details about expected useful lives of buildings, depreciation schedules, salvage value, and the like, which would be needed to be more precise.) Third, there should be no doubt that the interference with “reasonable investment-backed expectations” is dramatic. The rather awkward phrase is most useful when applying the regulatory takings test to a government action that prohibits or modifies a planned future use of property when the property owner has already begun making substantial investments to prepare for the new use. The phrase also clearly applies to substantial investments in an established lawful use.
My colleagues explain away the third factor here by noting that the plaintiff freely agreed to the conditional zoning provision that limited the commercial zoning to his ownership of the property. That is correct, and the result should substantially reduce the amount of compensation that the plaintiff is due. His takings claim should not be decided as if he had a right to sell the property with the commercial zoning in place.[3] But he did have a right to expect the county to abide by the ordinance it enacted, allowing him to continue the commercial use as long as he owned the property. That expectation was entirely reasonable and was backed up with substantial investments.
My colleagues dismiss the third factor by disregarding the difference between having to stop the commercial use now and having to stop it some years hence, upon the plaintiffs death or sale of the property. It is as if we were telling a widow with a life estate in her residence that forcing her to leave the property now will not cause her any loss because she had only a limited right to begin with. The difference between the immediate prohibition on commercial use of plaintiffs property and the original limitation that he agreed to is equally significant.
The majority’s dismissal of plaintiffs takings claim is inconsistent with a substantial body of regulatory takings law. When we survey regulatory takings cases, we see that a local government can usually prohibit a contemplated future use without effecting a regulatory taking, at least as long as the prohibition does not bar all economically viable use of the property. See Lucas v. South Carolina Coastal Council, 505 U.S. 1003, 1015-16, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992); Eternalist Foundation, Inc. v. City of Platteville, 225 Wis.2d 759, 593 N.W.2d 84, 90 (1999); Zealy v. City of Waukesha, 201 Wis.2d 365, 548 N.W.2d 528, 531-32 (1996), citing Lucas, 505 U.S. at 1016, 112 S.Ct. 2886. Following the Supreme Court’s decision in Penn Central, one of the usual lines of dispute in regulatory takings cases is whether the property owner has sufficient and reasonable “investment-backed expectations” in a planned use so as to give rise to a compensable regulatory taking. See Palazzolo v. Rhode Island, 533 U.S. 606, *432 617-18, 632, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001) (remanding for examination of claims under Penn Central)', Concrete Pipe, 508 U.S. at 645-46, 113 S.Ct. 2264, 124 L.Ed.2d 539 (1993) (evaluating the degree of interference with Concrete Pipe’s “reasonable investment-backed expectations”); Ruckelshaus v. Monsanto Co., 467 U.S. 986, 1011, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (explicit governmental guarantee formed the basis of a “reasonable investment-backed expectation”); see also Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) (early regulatory takings case finding statute forbidding coal mining under houses a “taking”; considered by the Penn Central Court, 438 U.S. at 127, 98 S.Ct. 2646, as the “leading case for the proposition that a state statute ... may so frustrate distinct investment-backed expectations as to amount to a ‘taking’ ”); Zealy, 548 N.W.2d at 531, quoting Penn Central, 438 U.S. at 124, 98 S.Ct. 2646 (in evaluating whether there has been a regulatory taking, courts should consider “the character of the governmental action,” the “economic impact of the regulation on the claimant,” and the “extent to which the regulation has interfered with distinct investment-backed expectations”).
The majority’s rejection of the plaintiffs takings claim is inconsistent with these many regulatory taking cases deciding whether owners have made sufficient investments in planned future uses. If the majority is correct, if the government may simply prohibit what had been an existing lawful use of the property and avoid paying compensation so long as the property retains any economic value, then a discussion of investment-backed expectations required by the Penn Central balancing test would be utterly beside the point. The same could be said for the third factor (“the degree of interference with the landowner’s anticipated and distinct investment opportunities”) in the constructive takings test the majority takes from Concrete Pipe. Ante at 424-25, citing 508 U.S. at 644-46, 113 S.Ct. 2264. Under the majority’s approach to the takings question, the courts considering the Penn Central or Concrete Pipe factors should simply say that the government can change the rules whenever it likes, without causing a compensable taking, as long as the property retains some economically viable use. That is not the law.
The majority’s approach here also conflicts with a vast body of zoning cases dealing with prior non-conforming uses. Those cases show how courts and legislatures have been reluctant to mandate changes to existing uses of property, even where, as in Wisconsin, the “spirit of zoning is to restrict and eventually eliminate ” non-conforming use. Waukesha County v. Pewaukee Marina, Inc., 187 Wis.2d 18, 522 N.W.2d 536, 542 (1994) (use that existed when ordinance was enacted is protected as a legal non-conforming use); Town of Yorkville v. Fonk, 3 Wis.2d 371, 88 N.W.2d 319, 322 (1958) (a vested right existed only for use of the property that had begun by the time the law was changed, not for partially completed extensions of non-conforming use to new property); see also State ex. rel. Covenant Harbor Bible Camp v. Steinke, 7 Wis.2d 275, 96 N.W.2d 356, 361 (1959) (“Legislatures have generally refrained from requiring an immediate discontinuance of non-conforming uses presumably because of doubt that such a provision would be constitutional.”). All of those cases are misguided if this retroactive prohibition on an existing and lawful use is permitted without compensation.
I grant that there have been cases in which courts have allowed prohibitions on existing land uses without compensation. See Penn Central, 438 U.S. at 126-27, 98 *433 S.Ct. 2646 (reviewing cases in which the Supreme Court had upheld prohibitions on established uses). But those cases almost always involved some “noxious” or nuisance use of the property. The cases that went the farthest in allowing prohibitions on existing land uses predated modern regulatory takings jurisprudence and its focus on investment-backed expectations. See Goldblatt v. Town of Hempstead, 369 U.S. 590, 596, 82 S.Ct. 987, 8 L.Ed.2d 130 (1962) (ordinance regulating mining below the water table was valid regulation); Hadacheck v. Sebastian, 239 U.S. 394, 36 S.Ct. 143, 60 L.Ed. 348 (1915) (upholding ordinance prohibiting operation of otherwise lawful brickyard business that legislature found inconsistent with neighboring uses); Mugler v. Kansas, 123 U.S. 623, 8 S.Ct. 273, 31 L.Ed. 205 (1887) (outlawing an established brewery was not a taking when the entire state was going “dry”). Goldblatt probably went farther than any other ease in allowing a local government to prohibit an existing use, but it was justified by the later growth of residences around the mining operation, and most important, there was no actual evidence of loss of value. 369 U.S. at 594 & n. 3, 82 S.Ct. 987.
These nuisance-type cases are the exception that proves the rule of the importance of the difference between existing uses and future uses. As Professor Serkin has explained: “Applying the nuisance exception, the government can regulate away a hazardous or injurious activity without paying compensation.... Framed as an exception to takings liability, the nuisance inquiry ... assumes and reinforces the background rule that existing uses cannot be eliminated unless they are nuisances.” Christopher Serkin, “Existing Uses and the Limits of Land Use Regulations,” 84 New York Univ. L.Rev. 1222, 1240 (2009)[4]
In fact, the result in Penn Central itself turned on the fact that the regulatory change did not interfere at all with the existing uses of the Grand Central Terminal property. The Supreme Court explained that the New York City historic landmark designation of the terminal did not effect a taking where it did not interfere with the present, established use of the terminal, and where the owners could “continue to use the property precisely as it has been used for the past 65 years.” 438 U.S. at 136, 98 S.Ct. 2646.
Since Penn Central, the Supreme Court has not held that a regulatory change prohibiting what had been a lawful, existing use of property was not a compensable taking. Such cases no longer arise because the law is so clear. Instead, the Supreme Court’s more recent cases show that the threshold for a regulatory taking is lower, and can apply to denial of a planned use if the owner can show sufficient investment in its expectation that it could use the property in the planned way. See Palazzolo, 533 U.S. at 616, 121 S.Ct. 2448 (remanding for further consideration of the Penn Central factors in analysis of wetlands regulation on planned development for coastal property); Lucas, 505 U.S. at 1019 n. 8, 112 S.Ct. 2886 (“as we have acknowledged time and again, ‘[t]he economic impact of the regulation on the *434 claimant and ... the extent to which the regulation has interfered with distinct investment-backed expectations’ are keenly relevant to takings analysis generally”) (citation omitted).
The majority relies upon Zealy v. City of Waukesha, 194 Wis.2d 701, 534 N.W.2d 917, 920 (1995), for the proposition that a regulatory or constructive taking will be found only where a government regulation has “rendered the property practically useless for all reasonable purposes.” The first problem with this reliance is that the Wisconsin Supreme Coui't reversed the cited decision. See Zealy v. City of Waukesha, 201 Wis.2d 365, 548 N.W.2d 528 (1996). The Wisconsin Supreme Court decision held that a local government had not effected a compensable taking by classifying a portion of the plaintiffs property as a wetlands conservancy district that could no longer be developed for residential use. The state supreme court admittedly invoked the often-stated “rule” that a regulation must deny the landowner all or substantially all practical uses of a property to effect a compensable taking. Id. at 531. The cases it cited for this proposition, however, involved prohibitions on possible or planned new uses, not prohibitions on established and lawful uses. In holding that there had been no taking, moreover, the state supreme court emphasized that the wetlands in question could still be used for their lawful and historical use as farmland. Id. at 534.
Then the Wisconsin Supreme Court turned to the owner’s argument that he had a vested right in the prior zoning law that had allowed for residential use. The court rejected that claim on grounds that are telling for this case. There was no vested right in the prior zoning itself, and the owner in Zealy had no vested right in future residential development because he had not “shown that he made any expenditures in reliance on the zoning, nor has he ever submitted an application for a building permit proposing a residential use of the land.” Id. at 534-35, citing Lake Bluff Housing Partners. Bettendorfs takings claim is supported by precisely the sort of facts that were missing in Zealy: he has made expenditures for commercial use of the property that the local government now insists must end.
The Lake Bluff Housing Partners opinion provides a thorough guide to Wisconsin’s law of vested rights. See Lake Bluff Housing Partners, 540 N.W.2d at 194-97. The state supreme court’s discussion focuses on when an owner’s plans for a new use have gone so far as to give rise to vested rights that cannot be taken by a change in zoning law. By the force of that reasoning, there can be no doubt that an owner has vested rights in an already existing and lawful use of the property.
These discussions of vested rights under Wisconsin law pertain to zoning law, and the premise is that a local government cannot change zoning on a property so as to prohibit an already-existing use or a planned use in which the owner has vested rights. See Wis. Stat. § 59.69(10)(a) (zoning ordinances “may not prohibit the continuance of the lawful use of any building, premises, structure, or fixture for any trade or industry for which such building, premises, structure, or fixture is used at the time that the ordinances take effect”). But the link to the state constitutional takings clause is clear. See, e.g., Town of Cross Plains v. Kitt’s Field of Dreams Korner, Inc., 321 Wis.2d 671, 775 N.W.2d 283, 288 (2009), citing State ex rel. Covenant Harbor Bible Camp v. Steinke, 7 Wis.2d 275, 96 N.W.2d 356 (1959) (“protection of lawful nonconforming uses ... arises out of the concern that the retroactive application of zoning ordinances would *435 render their constitutionality questionable”).
The potential injustices that could result from the majority’s decision today can be illustrated by considering some hypothetical scenarios: Suppose zoning allows highrise multi-family residences on a property. After an apartment building is built at great expense, the local government or a state court decides the zoning for the site was invalid, so the building cannot be occupied by more than one family. Wouldn’t that be a compensable taking? Or suppose zoning is amended to allow a steel mill on a site. The owner and investors pour several hundred million dollars into construction and begin operations. Neighboring residents and businesses then find the noise and odor to be worse than they expected, and they convince the local government to revoke the zoning that authorized the steel mill. Wouldn’t that also be a compensable taking? I do not see a principled distinction between those examples and the retroactive change in the law that the majority’s decision allows here without compensation to the affected property owner.
I do not mean to suggest that local government can never change the law to prohibit an existing lawful use without effecting a compensable taking of property. The United States Supreme Court has avoided such a bright line, as have the Wisconsin courts. But apart from the nuisance or noxious use cases, such cases are at best rare. A finding of no taking in such a case requires at the very least a careful application of the Penn Central balancing test. In this case, perhaps a full record would reveal new facts that would cast the entire controversy in a different light. In the end, however, I do not think we can decide on the bare pleadings that plaintiff Bettendorf has no viable state law takings claim. I would reverse the district court’s dismissal of plaintiffs state law takings claim and would remand, either for further proceedings in the district court or for dismissal without prejudice so that plaintiff could pursue relief in the state courts. See 28 U.S.C. § 1367(c) (authorizing district court to decline to exercise jurisdiction over state law claims within the court’s supplemental jurisdiction). Finally, I note that our prediction of Wisconsin law is not binding on Wisconsin courts. Perhaps the Wisconsin Supreme Court will have an occasion to consider these questions in the near future.[5]

. Properly calculating just compensation in this case would require some subtle calculations taking into account Bettendorf’s life expectancy and the useful lives of his investments and their salvage value, among other factors.

. Professor Serkin's article provides detailed support for my description of the special protection that takings law and related aspects of property law provide for existing uses. It’s only fair to add, however, that the principal point of his article is that he believes existing law provides too much protection for existing uses, and that governments should have much more power to prohibit or modify existing uses without paying compensation. See 84 N.Y.U. L.Rev. at 1223-26. For the reasons I explain in this opinion, I do not believe we can predict that the Wisconsin Supreme Court is ready to abandon that degree of protection for existing uses of property.

. Lurking in this case are two issues that sharply divided the Supreme Court of the United States without producing a majority opinion in Stop the Beach Renourishment, Inc. v. Florida Dep’t of Environmental Protection, - U.S. -, 130 S.Ct. 2592, 177 L.Ed.2d 184 (2010). The issues are first, whether a court decision can effect a compensable taking of property, and second, if so, what role federal courts might play in reviewing those decisions. Justice Scalia’s plurality opinion for four Justices concluded that a state court decision could effect a compensable taking by reversing well-established property law, and that such issues could be brought to the Supreme Court but probably not to lower federal courts. See 130 S.Ct. at 2602, 2609 (plurality opinion). Four other Justices declined to reach the first issue and pointed out the potential for significant change in the roles of federal courts in deciding state property law. See id. at 2613-18 (Kennedy, J., concurring in the judgment); id. at 2618-19 (Breyer, J., concurring in the judgment). I do not think we need to reach these issues in this case because I do not think the state court decision itself effected any taking of Bettendorf's property. It is the county’s threats to enforce the revised zoning law that may have already effected a temporary taking of his property and the county's efforts to enforce the court decision that could effect a permanent taking.